COMMONWEALTH *vs.* WILLIAM CHAPMAN & another.

The publication of a false and malicious libel has always, by the common law of Massachusetts, been an offence punishable by indictment.

THIS case was argued by *Hallett,* for the defendants, and by *Porter,* (District Attorney,) for the Commonwealth. The opinion of the court was delivered, at September term 1848, by SHAW, C. J. This was an indictment against the defendants for a false and malicious libel, tried before the court of common pleas, and, upon a conviction there, the case is brought before this court, upon an exception which has been most elaborately argued by the learned counsel for the defendants, and which, if sustained, must go to the foundation of the prosecution; namely, that there is no law of this Commonwealth by which the writing and publishing of a malicious libel can be prosecuted by indictment, and punished as an offence. The proposition struck us with great surprise, as a most startling one; but as it was seriously presented and earnestly urged in argument, we felt bound to listen, and give it the most careful consideration; but after the fullest deliberation, we are constrained to say, that we can entertain no more doubt upon the point than we did when it was first offered.

It is true that there is no statute of the Commonwealth declaring the writing or publishing of a written libel, or a malicious libel ⌐y signs and pictures, a punishable offence. But this goes little way towards settling the question. A great part of the municipal law of Massachusetts, both civil and criminal, is an unwritten and traditionary law. It has been common to denominate this "the common law of England," because it is no doubt true that a large portion of it has been derived from the laws of England, either the common law of England, or those English statutes passed before the emigration of our ancestors, and constituting a part of that law, by which, as English subjects, they were governed when they emigrated; or statutes made afterwards, of a

Commonwealth *v.* Chapman & another.

general nature, in amendment or modification of the common law, which were adopted in the colony or province by general consent.

In addition to these sources of unwritten law, some usages, growing out of the peculiar situation and exigencies of the earlier settlers of Massachusetts, not traceable to any written statute or ordinance, but adopted by general consent, have long had the force of law ; as, for instance, the convenient practice, by which, if a married woman join with her husband in a deed conveying land of which she is seized in her own right, and simply acknowledge it before a magistrate, it shall be valid to pass her land, without the more expensive process of a fine, required by the common law. Indeed, considering all these sources of unwritten and traditionary law, it is now more accurate, instead of the common law of England, which constitutes a part of it, to call it collectively the common law of Massachusetts.

To a very great extent, the unwritten law constitutes the basis of our jurisprudence, and furnishes the rules by which public and private rights are established and secured, the social relations of all persons regulated, their rights, duties, and obligations determined, and all violations of duty redressed and punished. Without its aid, the written law, embracing the constitution and statute laws, would constitute but a lame, partial, and impracticable system. Even in many cases, where statutes have been made in respect to particular subjects, they could not be carried into effect, and must remain a dead letter, without the aid of the common law. In cases of murder and manslaughter, the statute declares the punishment ; but what acts shall constitute murder, what manslaughter, or what justifiable or excusable homicide, are left to be decided by the rules and principles of the common law. So, if an act is made criminal, but no mode of prosecution is directed, or no punishment provided, the common law furnishes its ready aid, prescribing the mode of prosecution by indictment, the common law punishment of fine and imprisonment. Indeed, it seems to be too obvious to require argument, that without the

common law, our legislation and jurisprudence would be im
potent, and wholly deficient in completeness and symmetry,
as a system of municipal law.

It will not be necessary here to consider at large the sources
of the unwritten law, its authority as a binding rule, derived
from long and general acquiescence, its provisions, limits,
qualifications, and exceptions, as established by well authen-
ticated usage and tradition.  It is sufficient to refer to 1 Bl.
Com. 63 & seq.

If it be asked, " how are these customs or maxims, consti-
tuting the common law, to be known, and by whom is their
validity to be determined ? " Blackstone furnishes the answer ;
"by the judges in the several courts of justice.  They are
the depositaries of the laws, the living oracles, who must de-
cide in all cases of doubt, and who are bound by oath to
decide according to the law of the land.  Their knowledge
of that law is derived from experience and study," " and from
being long personally accustomed to the judicial decisions of
their predecessors."   1 Bl. Com. 69.

Of course, in coming to any such decision, judges are bound
to resort to the best sources of instruction, such as the records
of courts of justice, well authenticated histories of trials, and
books of reports, digests, and brief statements of such decis-
ions, prepared by suitable persons, and the treatises of sages
of the profession, whose works have an established reputation
for correctness.

That there is such a thing as a common or unwritten law
of Massachusetts, and that, when it can be authentically es-
tablished and sustained, it is of equal authority and binding
force with the statute law, seems not seriously contested in
the argument before us.  But it is urged that, in the range
and scope of this unwritten law, there is no provision, which
renders the writing or publishing of a malicious libel punish-
able as a criminal offence.

The stress of the argument of the learned counsel is de-
rived from a supposed qualification of the general proposition
in the constitution of Massachusetts, usually relied on in

proof of the continuance in force of the rules and principles of the common law, as they existed before the adoption of the constitution. The clause is this: Chap. 6, Art. 1, Sect. 6: "All the laws which have been adopted, used and approved in the province, colony or state of Massachusetts Bay, and usually practised on in the courts of law, shall still remain and be in full force until altered or repealed by the legislature ; such parts only excepted as are repugnant to the rights and liberties contained in this constitution."

It is then argued, that it is in virtue of this clause of the constitution, that the common law of England, and all other laws existing before the revolution, remain in force, and that this clause so far modifies the general proposition, that no laws are saved, but those which have been actually applied to cases in judgment in a court of legal proceeding ; and unless it can be shown affirmatively that some judgment has been rendered, at some time before the adoption of the constitution, affirmative of any particular rule or principle of the common law, such rule is not brought within the saving power of this clause, and cannot therefore be shown to exist. We doubt the soundness of this proposition, and the correctness of the conclusion drawn from it.

We do not accede to the proposition, that the present existence and effect of the whole body of law, which existed before the constitution, depends solely upon this provision of it. We take it to be a well settled principle, acknowledged by all civilized states governed by law, that by means of a political revolution, by which the political organization is changed, the municipal laws, regulating their social relations, duties and rights, are not necessarily abrogated. They remain in force, except so far as they are repealed or modified by the new sovereign authority. Indeed, the existence of this body of laws, and the social and personal rights dependent upon them, from 1776, when the declaration of independence was made, and our political revolution took place, to 1780, when this constitution was adopted, depend on this principle. The clause in the constitution, therefore, though

highly proper and expedient to remove douLts, and give greater assurance to the cautious and timid, was not necessary to preserve all prior laws in force, and was rather declaratory of an existing rule, than the enactment of a new one.   We think, therefore, it should have such a construction, as best to carry into effect the great principle it was intended to establish.

But further; we think the argument is unsound in assuming that no rule of the common law can be established under this clause of the constitution, without showing affirmatively, that in some judicial proceeding, such rule of law has been drawn in question and affirmed, previously to the adoption of the constitution.   During that time there were no published reports of judicial proceedings.   The records of courts were very imperfectly kept, and afford but little information in regard to the rules of law discussed and adopted in them. And who has examined all the records of all the criminal courts of Massachusetts, and can declare that no records of such prosecutions can be found?   But so far as it regards libel, as a criminal offence, we think it does appear, from the very full and careful examination of the late Judge Thacher, ( *Commonwealth* v. *Whitmarsh*, Thacher's Crim. Cases, 441,) that many prosecutions for libel were instituted in the criminal courts before the revolution, and none were ever quashed or otherwise disposed of, on the ground that there was no law rendering libels punishable.   In the case of the indictments returned against Governor Gage and others, very much against the will of the judges, those indictments were received and filed, and remained, until non prossed by the king's attorney general.   This investigation of the history of the common law of Massachusetts is so thorough, complete and satisfactory, that it is sufficient to refer to it, as a clear elucidation of the subject.

But we think there is another species of evidence to prove the existence of the common law, making libel an offence punishable by law, clear satisfactory and decisive; and that is, these rules of law, with some modification, caused by the

provisions of the constitution, have been affirmed, declared, and ratified by the judiciary and the legislative departments of the existing government of Massachusetts, by those whose appropriate province and constitutional duty it was to act and decide upon them; so that they now stand upon a basis of authority which cannot be shaken, and must so stand until altered or modified by the legislature.

When our ancestors first settled this country, they came here as English subjects; they settled on the land as English territory, constituting part of the realm of England, and of course governed by its laws; they accepted charters from the English government, conferring both political powers and civil privileges; and they never ceased to acknowledge themselves English subjects, and never ceased to claim the rights and privileges of English subjects, till the revolution. It is not therefore, perhaps, so accurate to say that they established the laws of England here, as to say, that they were subject to the laws of England. When they left one portion of its territory, they were alike subject, on their transit and when they arrived at another portion of the English territory; and therefore always, till the declaration of independence, they were governed and protected by the laws of England, so far as those laws were applicable to their state and condition. Under this category must come all municipal laws regulating and securing the rights of real and personal property, of person and personal liberty, of habitation, of reputation and character, and of peace. The laws designed for the protec tion of reputation and character, and to prevent private quarrels, affrays and breaches of peace, by punishing malicious _ibel, were as important and as applicable to the state and condition of the colonists, as the law punishing violations of the rights of property, of person, or of habitation; that is, as laws for punishing larceny, assault and battery, or burglary. Being part of the common law of England, applicable to the state and condition of the colonists, they necessarily applied to all English subjects and territories, as well in America as

in Great Britain, and so continued applicable till the declara-
tion of independence.

This, therefore, would be evidence, *a priori*, that they were
in force, and were adopted by the clause cited from the con-
stitution, except so far as modified by the excepting clause.

That the law of libel existed, at the first migration of our
ancestors, and during the whole period of the colonial and
provincial governments, is proved by a series of unquestiona-
ble authorities; and we are now to inquire, whether by the
acts done since the adoption of the constitution — acts of the
judiciary and legislature — these laws, with some modifica-
tion, have not been affirmed and declared in such a manner
as to bring them within the provision of the constitution, and
make them absolutely binding, until repealed by the legis-
lature.

A trial occurred soon after the adoption of the constitution,
in 1791, against Edmund Freeman, a printer in Boston, on an
indictment for a libel upon Mr. John Gardiner, then a barrister
at law, a justice of the peace, and a member of the house
of representatives    It was before there were any regular
reports of judicial proceedings; but, being a cause which ex-
cited much interest, it was reported for the newspapers and
magazines, from which a pretty satisfactory account of it can
be obtained.    A good abstract of it may be found in Judge
Thacher's able judgment already cited.    This case, in its va-
rious aspects, throws much light on the subject of inquiry.
The prosecution by indictment was instituted and conducted
by Sullivan, attorney general, who had studied and practised
the law before the revolution, was a member of the conven-
tion that framed the constitution, and was appointed a judge of
the supreme judicial court, at its first organization.   The trial
took place before a full court, composed of Sargeant, chief
justice, and Paine, Dana, Sumner and Cushing, justices.    The
first two must have entered on the study and practice of the
law not much later than the middle of the last century, and
the others but a few years later, and were men of mature

years, and practisers of long experience in the law, under the provincial government. Three of these judges had been members of the convention. Their construction, therefore, of this provision, had the force and effect of a contemporaneous exposition. They were eminently within the description of Blackstone, already cited, of judges whose knowledge of that law — the unwritten or customary law — is derived from experience and study, and from being "long personally accustomed to the judicial decisions of their predecessors," and of course qualified to expound and declare the common law. The defence was conducted by Mr. Amory and Mr. Otis, eminent for their learning and talents as lawyers. It is not necessary to state minutely the particulars of this trial. It is sufficient that all the judges regarded the English common law of libel as in force here, and cited freely Blackstone, Hawkins, Cowper's Reports, and other ante-revolutionary writers and cases, as the true and authoritative expounders of the existing law of Massachusetts. Nor was the law contested by the learned counsel for the accused, in their vigorous defence ; but they also cited and commented upon similar English authorities.

But we have already suggested that in sanctioning the principles of the common law of libel, as a criminal offence, the court did it with some qualification. Dana, J. in his address to the jury, mentioned that it had been objected to the doctrine of libel, that the truth of the charges cannot be given in evidence, because it is no justification, if it is true. He says this is undoubtedly the rule of law, as established by the courts of Great Britain, yet perhaps the courts here may lay down a different principle ; but this must depend upon the construction which they will give to the sixteenth article in the bill of rights, relative to the liberty of the press, and which declares that it "ought not to be restrained in this Commonwealth." But he expressly reserves his opinion upon that subject, because it did not arise in that case, there being no offer to prove the truth of the charges, in defence. This reserve was manifestly founded in this consideration,

viz. that the clause of the bill of rights might be so construed as to sanction the publication of every thing true, however much it might tend to provoke quarrels and breaches of the peace. Should it be so construed, then it would, to that extent, modify and abrogate the common law, which, it was conceded, prohibited giving the truth in evidence, in defence. It would then be brought within the excepting clause of that other article of the constitution, declaring that all laws heretofore adopted, used and approved, and usually practised on, shal. remain in force, such *parts only excepted* as are repugnant to the rights and liberties contained in the same constitution. In the case supposed, that part of the English common law of libel, which, on a criminal prosecution for that offence, prohibits the giving of the truth in evidence, will be abrogated, because repugnant to the constitution relative to the liberty of the press. But the conclusion would be, that the residue of the common law of libel would remain in force.

Afterwards, and after the constitution had been a subject of further judicial consideration, this exception, founded on the clause declaring the liberty of the press, to some extent, though not to the extent intimated by Mr. Justice Dana, was judicially declared, in the case of *Commonwealth* v. *Clap*, 4 Mass. 163. This case was decided by a court composed of Parsons, Sedgwick, Sewall, Thatcher and Parker, every member of the bench being changed since 1791. In this case it was held, that when a man shall consent to be a candidate for a public office, conferred by the election of the people, he must be considered as putting his character in issue, so far as it may respect his fitness and qualifications for the office, and that publications *of the truth* on this subject, with the honest intention of informing the people, are not libels. And every man holding a public office may be considered as within the principle. But the publication of a libel maliciously, and with intent to defame, is clearly an offence against law.

This case of *Commonwealth* v. *Freeman*, affirmed by the later case cited, is a striking illustration of the maxim, that

the exception proves the rule. If there were no law making libel a criminal offence, there would be no question of defence. The adjudication, that a particular clause of the criminal law of libel is excepted by the clause in the constitution, proves conclusively that the general law, subject to such exception, was adopted and affirmed by it.

These decisions have been followed by a long course of prosecutions for libel, as a criminal offence, extending through more than half a century, in which the existence of this rule of common law has never before been doubted by any judge called, in the course of official duty, to act on the subject.

We have suggested that there is another and distinct species of evidence, arising after the constitution, showing that the common law, making libels criminal, and punishing them by indictment, was adopted and continued in force. We alluded to the acts and declarations of the legislature. An act regulating the mode of prosecution and defence, in criminal proceedings for libel, is as clear an admission and declaration of the existence of the law on which such prosecutions are founded, as can possibly arise upon implication. By the Rev. Sts. *c.* 82, § 28, and *c.* 86, § 10, an appeal to this court is allowed to any person convicted in the court of common pleas or municipal court, upon indictment for a libel. This law, it is true, was afterwards repealed by *St.* 1839, *c.* 161; but that does not impair the force of the implication. That implication is just as strong, by providing that on such criminal prosecution there shall be no appeal.

But a more striking declaration, of the same sort, is found in Rev. Sts. *c.* 133, § 6, following, nearly in terms, the *St.* of 1826, *c.* 107, § 1. The provisions are, that " in every prosecution for writing or for publishing a libel, the defendant may give in evidence, in his defence, upon the trial, the truth of the matter contained in the publication charged as libellous ; provided, that such evidence shall not be deemed a sufficient justification, unless it shall be further made to appear on the trial, that the matter charged to be libellous was published with good motives and for justifiable ends."

7 *

*Commonwealth v. Chapman & another.*

These provisions, recognizing the existence of the law of libel, and directing the mode of prosecution and defence, are as distinct a declaration and affirmance of that law, on the part of two distinct legislatures, at an interval of ten years from each other, as a statute expressly reciting the adoption and existence of this law. A declaration like this, on the part of the legislature, embracing, as it must, the authority of the governor, as well as the senate and house of representatives, not made to serve a turn, but in the ordinary course of legislation, is entitled to great weight, as evidence of the preëxisting common law.

In *Commonwealth* v. *Clap,* 4 Mass. 167, it was stated by the attorney general, Bidwell, that it was the constant practice of the court, in their charges to the grand juries, to mention libels as a proper subject for their inquiry; and as there was no statute animadverting on this species of offence, he drew the natural conclusion, that it must be in virtue of the common law, that they were so charged. The fact, that *it was the practice, so long as grand juries attended the supreme judicial court, so to charge them, is probably still within the recollection of many of the older practitioners.*

These declarations of the legislature, and the contemporary exposition of the constitution by the older judges, immediately after its adoption, together with an uninterrupted course of judicial practice to the present time, form a body of proof that the common law, making the publication of a malicious libel a criminal offence, has been adopted in this Commonwealth, entirely conclusive and irrefragable; and he must be a bold judge, who should venture to decide that there is not now, and never has been, any such law, and that all the judgments which have been pronounced by the courts of this State, on convictions for this offence, have been erroneous.

*Exceptions overruled.*