NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12620

COMMONWEALTH vs. MARK ADAMS.


Middlesex.     January 7, 2019. - June 27, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, & Kafker, JJ.


Unlawful Interference.  Police Officer.



Complaint received and sworn to in the Lowell Division of the District Court Department on December 29, 2016.

The case was tried before John F. Coffey, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.


Ilir Kavaja for the defendant.
Melissa Weisgold Johnsen, Assistant District Attorney, for the Commonwealth.
Oren Nimni, Luke Ryan, & Molly Ryan Strehorn, for Committee for Public Counsel Services & others, amici curiae, submitted a brief.
Lisa J. Steele, for Commonwealth Second Amendment, amicus curiae, submitted a brief.


GAZIANO, J.  We address, for the first time, whether

interference with the lawful duties of a police officer is a

common-law crime in Massachusetts.

Part II, c. 6, art. 6, of the Massachusetts Constitution provides that the common law that existed before the 1780 adoption of that Constitution was "preserved and continued," and remains in full force until altered or repealed by the Legislature. Crocker v. Justices of the Superior Court, 208 Mass. 162, 171 (1911). After an examination of our Nineteenth Century jurisprudence concerning the illegal acts of "obstructing" or "hindering" a police officer, as well as other authoritative sources, we conclude that interference with the lawful duties of a police officer was, and continues to be, a common-law crime, albeit subject to carefully constructed limitations to avoid criminalizing constitutionally protected activities.

Because those limitations were exceeded in this case, we conclude that the evidence was not sufficient to establish that the defendant committed the crime of interference with a police officer.[1]

1. Background. a. Facts. We recite the facts in the light most favorable to the Commonwealth. See Commonwealth v.

---

[1] We acknowledge the amicus briefs submitted by the Committee for Public Counsel Services, Lawyers for Civil Rights, Massachusetts Association of Criminal Defense Attorneys, and American Civil Liberties Union of Massachusetts; and by Commonwealth Second Amendment.

Bolling, 462 Mass. 440, 442 (2012).  On December 28, 2016, the Tyngsboro police department suspended the defendant's class A license to carry firearms.  At 8:15 P.M. that day, three police officers went to the defendant's home to serve written notice of the suspension, and to retrieve his firearms and ammunition.  Sergeant Charles Melanson knocked on the front door, while two other officers stood to each side of the door.

The defendant, who was at home with his wife and teenaged son, answered the knock and stepped outside to speak with the officers.  Melanson explained that the officers were there to serve a suspension of the defendant's license to carry firearms, and to take his firearms (numbering fifteen) and ammunition from his home.  Melanson served the defendant with written notice of the license suspension.  The defendant became argumentative and visibly upset.  He repeatedly yelled that he was not going to give up his firearms, and that he intended to telephone his attorney.  He told his wife, who had come to the door, not to allow the officers to enter.

The defendant attempted to go back inside, but Melanson put his hand on the front door and held it shut.  Again, the officers told the defendant that they were there to confiscate his firearms.  He responded by insisting that he was not going to give up his guns, and requested an opportunity to consult with his attorney.  While this was going on, Sergeant Mark

Borque went up the front stairs and walked into the house to speak with the defendant's wife. The defendant told his wife not to answer any questions and to telephone his attorney. He protested that he was "[one hundred] percent" not giving up his guns, and would not provide the police with the combination to his gun safe. The defendant then again attempted to enter his home. The officers told him to stop, but he quickened his pace toward the front door. One of the officers tackled the defendant to the ground and, after a struggle, placed him under arrest.

The defendant disputed the officers' version of events. He testified that he told the police that he voluntarily would surrender his firearms, but, before doing so, he requested an opportunity to consult with his attorney to find out whether he had any legal recourse. The defendant was concerned that the police would mishandle his firearms, some of which were expensive or had sentimental value. The officers would not allow him to telephone his attorney, and entered his home without permission. The defendant followed them inside and demanded that they leave. At that point, he was tackled to the ground and placed under arrest.

b. Prior proceedings. In December 2016, a criminal complaint issued from the District Court charging the defendant with failure to surrender firearms, G. L. c. 269, § 10 (i);

being a disorderly person, G. L. c. 272, § 53; resisting arrest, G. L. c. 268, § 32B; and interference with a police officer. In March 2017, the defendant filed a motion to dismiss all charges due to a lack of probable cause. He argued that he had a right, pursuant to G. L. c. 140, § 129D, to maintain possession of his firearms pending an appeal from the suspension of his firearm license. A District Court judge denied the motion. In May 2017, the defendant filed a motion to suppress evidence seized from his home on the ground that police unlawfully had entered without a warrant. A different District Court judge allowed the motion after an evidentiary hearing. The judge found that no exception to the warrant requirement authorized the police to enter the defendant's home, forcibly open his gun safe, and confiscate his firearms and ammunition. As a result of the suppression order, the Commonwealth dismissed the charge of failure to surrender a firearm.

In September 2017, a two-day trial took place on the remaining charges of being a disorderly person, resisting arrest, and interference with a police officer. After the judge denied the defendant's motion for a required finding of not guilty, the jury convicted him of interference with a police officer and acquitted him of the other charges.

The defendant appealed from the conviction. He argues that the judge erred in denying his motion to dismiss the charges

because he was not required to surrender his firearms under G. L. c. 140, § 129D; the order immediately to surrender his firearms violated the Second Amendment to the United States Constitution; the evidence was insufficient to prove interference with a police officer; and the jury instructions "were woefully inadequate."  We transferred the case from the Appeals Court on our own motion.

2.  Discussion.  The defendant's appeal raises three issues.[2]  First, is the crime with which he was charged recognized under Massachusetts common law?[3]  Second, assuming that interference with a police officer is a common-law crime, what does it prohibit?  Third, was the evidence, considered in the light most favorable to the Commonwealth, sufficient to sustain the conviction?

a.  Whether interference with a police officer is an offense recognized under Massachusetts common law.  When the

---

[2] Because of the result we reach, we do not address the defendant's contention that the jury instructions were "woefully inadequate."

[3] The defendant did not challenge the common-law basis for the charge of interference with a police officer in the District Court, and does not raise the issue on appeal.  When we transferred the case from the Appeals Court, we solicited amicus briefs that addressed "[w]hether Massachusetts should recognize the common-law crime of interfering with a police officer in the lawful performance of his or her duties."  See G. L. c. 277, § 47A ("A defense or objection based upon . . . the failure to charge an offense may be raised by motion to dismiss prior to trial, but shall be noticed by the court at any time").

Massachusetts Constitution was adopted in 1780, Part II, c. 6, art. 6, provided for the continuation of the common law by declaring that all of the laws "usually practised on in the courts of law" were carried into effect as a matter of State law until altered or repealed by the Legislature, or declared invalid by a court.[4]  See Pinnick v. Cleary, 360 Mass. 1, 11 (1971) (art. 6 provides for continuation in Commonwealth of great body of common law); Crocker, 208 Mass. at 171 ("The general body of jurisprudence which had heretofore existed was thus preserved and continued").  The common law of the Commonwealth, "when it can be authentically established and sustained," is of "equal authority and binding force" to laws enacted by the Legislature.  Commonwealth v. Chapman, 13 Met. 68, 70 (1847).  See Sheehan, petitioner, 254 Mass. 342, 345 (1926) (definition of crimes "so far as not left to the common law" is province of Legislature).

One need not look far to find common-law crimes recognized in the Commonwealth that continue with "equal authority and binding force" today.  See Chapman, 13 Met. at 70.  In cases of

---

[4] Part II, c. 6, art. 6, of the Massachusetts Constitution provides, "All the laws which have heretofore been adopted, used and approved in the Province, Colony or State of Massachusetts Bay, and usually practised on in the courts of law, shall still remain and be in full force, until altered or repealed by the legislature; such parts only excepted as are repugnant to the rights and liberties contained in this constitution."

murder and manslaughter, G. L. c. 265, §§ 1 and 13, establish penalties, but "what acts shall constitute murder, what manslaughter, or what justifiable or excusable homicide, are left to be decided by the rules and principles of the common law."[5] Chapman, supra at 69. See, e.g., Commonwealth v. Carter, 481 Mass. 352, 364 (2019); Commonwealth v. Brown, 477 Mass. 805, 822 (2017), cert. denied, 139 S. Ct. 54 (2018); Commonwealth v. Paulding, 438 Mass. 1, 8 (2002).

i. Origins. Massachusetts common law derives originally "either [from] the common law of England, or those English statutes passed before the emigration of our ancestors." Chapman, 13 Met. at 68. Thereafter, it was shaped by "usages, growing out of the peculiar situation and exigencies of the earlier settlers of Massachusetts, not traceable to any written statutes or ordinances, but adopted by general consent." Id. at 69. See Commonwealth v. Knowlton, 2 Mass. 530, 534-535 (1807) (Massachusetts common law was brought from England by "our ancestors," and was amended and altered by practice and usage).

Our ability to trace the roots of a given common-law

---

[5] Other offenses that exist as part of Massachusetts common law include solicitation to commit a felony, see Commonwealth v. Barsell, 424 Mass. 737, 740 (1997); forgery, see Commonwealth v. Apalakis, 396 Mass. 292, 298 (1985); uttering a forged instrument, see Commonwealth v. Russell, 156 Mass. 196, 197 (1892); conspiracy, see Commonwealth v. Cantres, 405 Mass. 238, 240 (1989); and affray, see Commonwealth v. Nee, 83 Mass. App. Ct. 441, 444-445 (2013).

offense is hampered by a lack of regular reports of the early jurisprudence in the Commonwealth.  Prior to adoption of the Massachusetts Constitution, "[t]he records of courts were very imperfectly kept, and afford but little information in regard to the rules of law discussed and adopted in them."  Chapman, 54 Mass. at 70.  See Commonwealth v. Churchill, 2 Met. 118, 124 (1840) ("Before the revolution, we had no regular reports of judicial decisions . . . and the most familiar rules and principles of law").  In 1839, commissioners appointed by the Legislature to report on the substance of Massachusetts common-law offenses observed, "As there are no regular reports of our jurisprudence further back than from a period of about twenty years after the adoption of the constitution, we have no direct contemporary evidence of the law so adopted . . . ."  Preliminary Report of the Commissioners on Criminal Law, 1839 Senate Doc. No. 21, at 20 (1839 Preliminary Report).

The absence of a reported appellate decision, however, does not remove a criminal offense from the common law.  See Commonwealth v. Klein, 372 Mass. 823, 833 (1977) ("It is true that sometimes, even in a case of first impression, common law standards of criminality not previously defined are applied against a defendant"); Commonwealth v. Nee, 83 Mass. App. Ct. 441, 444-445 (2013) (absence of appellate decisions did not remove offense of "ancient provenance" from common law).  We

have rejected the narrow view that the common law could be regarded as adopted only if "it could be shown affirmatively that it had been adjudicated before the revolution."[6]  See Churchill, 2 Met. at 124.

ii.  Other authoritative sources.  As a result, we must look to other authoritative sources to ascertain the common law. The common law may be found in "usage and tradition, and the well known repositories of legal learning, [and] works of approved authority."  Churchill, 2 Met. at 124.  There is no doubt that these were the "great sources" of common law adopted by Part II, c. 6, art. 6, of the Massachusetts Constitution. Id.  We also have held that the common law of Massachusetts is reflected in "records of courts of justice, well authenticated histories of trials, and books of reports, digests, and brief statements of such decisions, prepared by suitable persons, and the treatises of sages of the profession, whose works have an established reputation for correctness."  See Chapman, 13 Met. at 70.

We thus undertake to trace the common-law history of interference with a police officer by examining the following available sources:  English law prior to, and contemporaneous

---

[6] In Commonwealth v. Shave, 81 Mass. App. Ct. 1131 (2012), the Appeals Court, in an unpublished decision issued pursuant to its rule 1:28, mentioned interference with a police officer as a crime, without discussion of the validity of the offense.

with, the adoption of the Massachusetts Constitution; our mid-Nineteenth Century case law that references the unlawful acts of "obstructing" or "hindering" a police officer; an 1844 report commissioned by the Legislature that described categories of common-law offenses known as "obstructing and perverting the course of justice"; the law usually and traditionally practiced in the Commonwealth as reflected in the 1972 Proposed Criminal Code of Massachusetts and contemporary Massachusetts court records from 1977 to 2018; and the common law of other jurisdictions.  Based on these sources, the common-law offense of interfering with a police officer was charged (and defendants were convicted of the offense) at least as early as 1634.

     iii.  <u>English law</u>.  We turn first to the common law of England.  The charge of interference with a police officer appeared in a 1634 English case involving a citizen's lawsuit against a constable for false imprisonment.  In <u>Sheffeld's Case</u>, Clayt. 10, 10-11 (1634), a constable questioned the plaintiff, who was a stranger, about which way he had come into town.  The plaintiff answered that he had come "over the bridge."  The judge found this to be a "scornfull answer," and noted that the plaintiff "had no Passe," yet nonetheless had determined to travel without one.  The judge decided that there was "good cause" to arrest the plaintiff for "opposing the Constable." See <u>Busch</u> v. <u>State</u>, 289 Md. 669, 675-676 (1981), quoting

Sheffeld's Case, supra (common-law offense of resisting, hindering, or obstructing officer was described long ago in Sheffeld's Case).  In Rex v. Brady, 2 Leach C.C. 803, 804 (1797), decided after the adoption of the Massachusetts Constitution, a defendant was charged with three offenses: assaulting an officer, and thereby hindering him; assaulting an officer; and that the defendant "had hindered, opposed, and obstructed [the officer] . . . in the due execution of his duty."

    iv.  Nineteenth Century Massachusetts cases.  Our early case law, by contrast, does not clearly establish interference with a police officer as an independent offense.  Rather, in most reported cases, the act of obstructing or hindering a police officer functions as an aggravating factor to a charge of assaulting a police officer.

    The closest support for the argument that interference with a police officer is a stand-alone common-law offense is found in Commonwealth v. Hastings, 9 Met. 259 (1845).  The indictment in Hastings alleged that the defendant,

> "with force and arms, in and upon one Grant Learned an assault did make, said Learned then and there being a police officer of the city of Boston, and then and there being in the lawful discharge of his duty as such police officer, and him then and there did beat, bruise, wound and evil treat, and did then and there obstruct, hinder and oppose said Learned, in the discharge of his duty as such police officer, and which he, the said Learned, was then and there attempting lawfully to perform."

Id. at 259-260.  The facts underlying the indictment established that Learned, who was appointed as a police officer to patrol a Boston theater, had arrested a patron for being drunk and disorderly.  Id. at 260.  On the way "towards the jail or watch house," Learned released the defendant on the defendant's promise to go directly home.  Id.  Instead, while still in Learned's sight, the defendant went straight into a barroom. Learned followed him inside and "retook" the defendant for the purpose of conveying him to jail.  Id.  "[T]he defendant thereupon interfered, and obstructed Learned."  Id.

The primary issue raised in Hastings's appeal was whether the police officer was assaulted while in the exercise of his legal authority to patrol the theater.  Id. at 261-262.  The less than clear language of the indictment could be read as charging Hastings either with one offense or with two separate offenses. In the first view, the indictment could be understood as a single offense of assaulting Learned, with the acts of obstructing or hindering a police officer aggravating that assault.  Id. at 260.  The indictment also could be construed, however, as alleging two separate offenses:  aggravated assault and interference with a police officer.  Id.

In that view, the first offense, aggravated assault, is described as, "with force and arms, in and upon one Grant

Learned an assault did make, said Learned then and there being a police officer of the city of Boston, and then and there being in the lawful discharge of his duty as such police officer." Id. at 259-260. The second offense, obstructing or hindering a police officer, could be supported based on the language in the indictment alleging that the defendant "and . . . then and there did beat, bruise, wound and evil treat, and did then and there obstruct, hinder and oppose said Learned, in the discharge of his duty as such police officer, and which he, said Learned, was then and there attempting lawfully to perform" (emphasis added). Id. at 260.

In a later decision, this court described interference with a police officer as an aggravating factor to simple assault. See Commonwealth v. Kirby, 2 Cush. 577, 582 (1849). The defendant in that case was charged with assaulting a constable and with "hindering and opposing [the constable] while engaged in the due and lawful execution of the duties of his office." Id. at 578. The defendant had prevented the constable from executing a warrant for the apprehension of a third party. Id. The defendant argued that the indictment was deficient because it failed to allege that he knew, at the time of the alleged interference, that the person entering the residence was a constable. Id. We concluded that the element of knowledge was sufficiently alleged, and that the indictment charged a simple

assault upon the constable with "the aggravation that it was made upon a constable while in the discharge of the duties of his office, and with the design of hindering and opposing him in the due execution of such official duty."  Id. at 581-582.  See Commonwealth v. McHugh, 157 Mass. 457, 458 (1892) (defendant was charged with "assault upon . . . a constable, while in the discharge of his duty," i.e., preventing constable from removing goods subject to attachment by forcibly grabbing hold of constable's coat and whiskers, and throwing him to floor); Commonwealth v. Tobin, 108 Mass. 426, 426 (1871) (defendant charged with assaulting police officer, "and then and there also" hindering or opposing officer in lawful discharge of his duties).

The practice of charging obstructing or hindering a police officer as an aggravated form of assault was described in Commonwealth v. Hyde, Thacher's Crim. Cas. 112 (Boston Mun. Ct. 1825).  The Commonwealth charged Hyde as follows:  "first, for an assault and battery committed upon Jason Braman, a constable of the city of Boston, on the 25th of May, 1825, said Braman being at the time in the actual discharge of the duties of said office:  second, for a riotous assembling together to commit an unlawful act, and for committing an assault upon the body of Jason Braman, a constable in the exercise of his said office." Id.  The judge addressed the limited statutory authority granted

justices of the peace to punish "all assaults and batteries that are not of a high and aggravated nature."  Id. at 113-114.  He concluded that "where there are circumstances of aggravation, as where the assault is committed upon a magistrate, a sheriff or other officer in the actual administration of his office, . . . the jurisdiction exceeds the power of a justice of the peace." Id. at 114.

          v.  1844 legislative commission report of the penal code. In 1837, the Legislature appointed a five-person commission to "reduce so much of the Common Law of Massachusetts, as relates to crimes and punishments and the incidents thereof, to a written and systematic Code."[7]  Resolves 1837, c. 30.  The commissioners examined "[a]n extensive mass of materials": "[n]umerous digests, treatises, and volumes of reports, . . . occupied wholly with the jurisprudence in relation to crimes and punishments."  1839 Preliminary Report, supra at 21.  In the preface to their final report, the commissioners assured the Legislature that "no part of it [had] been finally concluded upon without much care to avoid errors and omissions," and that "no degree of care [had] been wanting, nor any labor spared." Report of the Penal Code of Massachusetts, at iv (1844) (1844 Report).

---

          [7] This code was not codified.

Chapter 29 of the 1844 Report describes common-law offenses under the general topic of prohibitions against "Obstructing and Perverting the Course of Justice." Id. at xv. The offenses listed in that chapter include escape, refusing to receive a prisoner, refusing assistance to an officer, preventing or suppressing evidence, bribery, and common barratry (vexatious incitement of a baseless lawsuit). Notably, §§ 17 and 18 of that chapter describe, respectively, the common-law offenses of "threats and intimidation" and "other obstructions to the course of justice." 1844 Report, supra at xvi. Section 17 of chapter 29 of the 1844 Report states:

> "Whoever wilfully obstructs or attempts to obstruct the public legislation, or the due administration or execution of the law, by threats of violence against, or intimidation of, or endeavoring to intimidate, any member of the council, or senate, or house of representatives, or any legislative, executive, civil, military or judicial officer, or any officer, functionary or person legally charged with any duty in the administration, enforcement or execution of the law, shall be punished . . . ."

Section 18 of chapter 29 of the 1844 Report provides:

> "Whoever, otherwise than as specified in the preceding sections, wilfully and not in the legal exercise of any authority, power, function or right, guarantied or granted by the constitution or laws, prevents, obstructs, disturbs, defeats or perverts the public legislation, or due administration, enforcement and execution of the laws, whether by wilfully hindering any public, executive, legislative, judicial, civil or other officer, commissioner or functionary in, or wilfully diverting him from, the discharge of his duties and exercise of his rights and functions under the laws and constitution, or in any other way or by any other means, not authorized by law, shall be punished . . . ."

As described in the 1844 Report, and as applicable to the defendant's case, at that time Massachusetts common law included broad prohibitions against willfully obstructing or hindering governmental officials in the lawful performance of their duties.  It is significant that Massachusetts common law exempted from criminal liability the "legal exercise of any authority, power, function or right, guarantied or granted by the constitution or laws."  See id.  See also discussion, infra.

vi.  1972 Proposed Criminal Code.  More than a century later, the common-law offense described in § 17  of chapter 29 of the 1844 Report (obstruction by threats of violence or intimidation) reappeared in the 1972 Proposed Criminal Code of Massachusetts.[8]  The Proposed Criminal Code, drafted by the Governor's committee on law enforcement and administration of criminal justice, included a section prohibiting "obstructing government administration."  According to the provisions of that code, an individual would have committed a "class A misdemeanor" if he or she "use[d] force, violence or intimidation, or engage[d] in any other unlawful act with intent to interfere with a person he [or she] knows to be a public servant performing or purporting to perform an official function." Proposed Criminal Code of Massachusetts, c. 268, § 9(a)(1)

---

[8] This proposed code was not codified.

(1972). The crime of obstructing government administration did not apply to the "failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions." Id. at § 9(b).

vii. Contemporary Trial Court records. An examination of the Trial Court's electronic case management system, using records beginning in 1977 (when those records first became available electronically) through 2018, shows that 2,600 individuals were charged with interference with a police officer during that period. See Appendices A, B.

Of the 2,600 charges of that crime from 1977 through 2018, the overwhelming majority were charged after 1994. The number of offenses charged annually was in the single digits from 1977 through 1993, with a median of 2.5 per year. In 1994, the number of charges of interference with a police officer jumped to twenty-seven. Thereafter, the annual number of charges continued to increase, but remained less than one hundred annually, with a median of 48.5, through 2010. Beginning in 2011, the annual median of charges was 242, but overall the number of charges increased substantially in almost every year, reaching a high of 335 in 2018. From 2002 through 2018, the crime of interference with a police officer was the most serious offense of which a defendant was convicted in 147 cases, or 5.65

percent of the number of times it was charged.

This significant increase in charges of interfering with a police officer coincided with the 1994 publication of a District Court complaint manual. The administrative office of the District Court published the manual to provide "offense codes and charging language for more than 5,000 offenses." District Court Complaint Language Manual, at 1 (rev. Apr. 13, 2018). The complaint manual includes the common-law offenses of affray, criminal contempt of court, escape from a police officer, interference with a police officer, resisting arrest, soliciting another to commit a felony, obstruction of justice, forgery, and uttering. Under these definitions, an individual interfered with a police officer if he or she "did intimidate, hinder or interrupt a police officer in the lawful performance of his or her duty, in violation of the Common Law." Id.

viii. Common law in other jurisdictions. Finally, in defining Massachusetts common law, we also consider the common law of other jurisdictions, as well as statements of contemporary commentators. Cf. Commonwealth v. Barsell, 424 Mass. 737, 739 (1997) (other States and commentators support conclusion that common-law solicitation to murder is misdemeanor).

Connecticut, Maryland, Michigan, South Carolina, and Tennessee recognize that the offense of interference with a

police officer existed in their common law.  See <u>State</u> v. <u>Beck</u>, 5 Conn. Cir. Ct. 587, 589 (1969); <u>Roddy</u> v. <u>Finnegan</u>, 43 Md. 490, 505 (1876); <u>People</u> v. <u>Krum</u>, 374 Mich. 356, 361, cert. denied, 381 U.S. 935 (1965); <u>State</u> v. <u>Kirven</u>, 279 S.C. 541, 543 (1983); <u>Pope</u> v. <u>State</u>, 528 S.W.2d 54, 56 (Tenn. Crim. App. 1975).  See also J. Miller, Handbook of Criminal law 461 (1934) ("Any willful obstruction of justice by resisting an officer who is endeavoring to perform his official duty is a misdemeanor at common law . . ."); R.M. Perkins, Criminal Law 495-497 (2d ed. 1969) ("One of the most common forms of obstruction of justice involves an interference with a public officer in the discharge of his official duty"); 4 C.E. Torcia, Wharton's Criminal Law § 567 (15th ed. 1996) ("At common law, the obstruction of or resistance to the performance of a governmental function, as where a police officer or other public servant is obstructed in the performance of his duty, constitutes an offense").

In sum, we conclude that the offense of interference with a police officer existed in Massachusetts common law.  We turn to the question of what it prohibits, and what it does not.

b.  <u>What constitutes the offense of interference with a police officer</u>?  "In the prosecution of crimes under the common law apart from statute, ordinarily it is necessary to allege and prove a guilty intent, and as a general principle a crime is not committed if the mind of the person doing the act is innocent."

Commonwealth v. Mixer, 207 Mass. 141, 142 (1910).  See Commonwealth v. Hawkins, 157 Mass. 551, 553 (1893) ("It is a general rule in criminal proceedings at common law that the defendant cannot be convicted unless a criminal intent is shown . . ."); Commonwealth v. Presby, 14 Gray 65, 66-67 (1859) ("To constitute a criminal act, there must, as a general rule, be a criminal intent").

Thus, we begin with the Commonwealth's burden to establish a defendant's criminal intent.  As described in the 1844 Report, the offense of interference with a police officer required the Commonwealth to prove that a defendant's conduct was "wilful[]." Noah Webster's An American Dictionary of the English Language, published in 1828, defines "willful" as "[g]overned by the will without yielding to reason; obstinate; stubborn; perverse; inflexible; as a willful man."  "Willful," as used in modern times, means "intentional without making reference to any evil intent" (quotation and citation omitted).  Commonwealth v. Luna, 418 Mass. 749, 753 (1994).  See Commonwealth v. Brennan, 481 Mass. 146, 154 (2018) ("willful" requires intentional conduct, not accidental).  Black's Law Dictionary defines "willful" as "[v]oluntary and intentional, but not necessarily malicious." Black's Law Dictionary 1834 (10th ed. 2014).

Accordingly, to convict a defendant of interference with a police officer, the Commonwealth must prove that the defendant

intended his or her conduct, and intended "the harmful consequences of the conduct -- that is, the interference with, obstruction, or hindrance."  See Commonwealth v. Joyce, 84 Mass. App. Ct. 574, 578 (2013) (interpreting willful interference with firefighter statute to require intent to interfere).  After all, without an intent element, it would be a violation of the law "to stand near a police officer and persistently attempt to engage the officer in conversation while the officer is directing traffic at a busy intersection."  Houston v. Hill, 482 U.S. 451, 479 (1987).  See Cocroft v. Smith, 95 F. Supp. 3d 119, 126 (D. Mass. 2015) (observing that "if Massachusetts were to recognize the common-law offense of obstructing a police officer in the performance of his duty, a conviction would require proof that the alleged violator acted with specific intent to intimidate, hinder or interrupt the officer").

With respect to the conduct that is prohibited by the common-law crime of interference with a police officer, the nature of the offense is shaped, in large part, by the common-law restriction against the use of interference with a police officer to criminalize the free exercise of rights "guarantied or granted by the constitution or laws."  See § 18 of chapter 29 of the 1844 Report.

For guidance, we turn to case law from other jurisdictions involving constitutional challenges to statutes or ordinances

that prohibit interference with a police officer.  In Hill, the United States Supreme Court considered an overbreadth challenge to a city ordinance providing that "[i]t shall be unlawful for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty" (citation omitted).  Hill, 482 U.S. at 455.  The "assault" and "strike" portions of the ordinance were preempted by provisions of the Texas Penal Code, leaving only that portion of the ordinance making it unlawful for "any person to . . . in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty" (citation omitted).  Id. at 461.  This remaining portion was overbroad, because it prohibited a "substantial amount of constitutionally protected conduct," such as verbally interrupting a police officer while the officer was on duty.  Id. at 458, 462 & n.11.  In striking down the ordinance, the Court noted that the First Amendment to the United States Constitution "protects a significant amount of verbal criticism and challenge directed at police officers." Id. at 461.  The Court commented, "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."  Id. at 462-463.

The Court recognized that the ordinance furthered the

government's legitimate interest in maintaining public order. Id. at 464. It is constitutionally permissible to prohibit individuals from physically obstructing a police officer. Id. at 462 n.11. It also is constitutionally permissible to prohibit an individual from obstructing a police officer through the use of "threats of violence"[9] against that officer (so-called "fighting words"). Id. at 463 n.12. The police do not, however, have unfettered discretion to arrest someone for speech that annoys or offends. Id. at 465. See Duran v. Douglas, 904 F.2d 1372, 1378 (9th Cir. 1990) ("expression of disapproval toward a police officer . . . [falls] squarely within the protective umbrella of the First Amendment").

The Supreme Court of Minnesota nonetheless has rejected an overbreadth challenge to Minnesota's statute prohibiting interference with a peace officer. See State v. Krawsky, 426 N.W.2d 875, 876 (Minn. 1988). That statute provided, in relevant part, "Whoever intentionally obstructs, hinders or prevents the lawful execution of any legal process, civil or criminal, or . . . interferes with a peace officer while the officer is engaged in the performance of official duties . . . may be sentenced . . . ." Minn. Stat. § 609.50 (1986). The court distinguished Hill, 482 U.S. 451, and thus was able to

---

[9] See § 17 of chapter 29 of the 1844 Report.

uphold the statute, by interpreting § 609.50 as "directed solely at physical acts, whereas the ordinance in [Hill] was significantly broader, prohibiting verbal criticism directed at police." Id. at 876-877. In addition, the physical acts prohibited by the Minnesota statute involved "physically obstructing or interfering with an officer, whereas under the ordinance in [Hill] one could be punished for merely 'interrupting' an officer in the line of duty." Id. at 877. Consistent with Hill, the Minnesota court also stated that "[t]he statute may be used to punish 'fighting words' or any other words that by themselves have the effect of physically obstructing or interfering with a police officer in the performance of his duties." Id. See State v. Leigh, 278 N.C. 243, 246 (1971) (speech alone cannot be punished as opposition of police officer); State v. Williams, 171 Wash. 2d 474, 485-486 (2011) (crime of obstructing officer requires some conduct in addition to pure speech).

The principle underlying the Massachusetts common-law restriction against criminalizing "the legal exercise of any authority, power, function or right, guarantied or granted by the constitution or laws," see § 18 of chapter 29 of the 1844 Report, can be distilled to the premise that "a person does not violate the law by doing what he has a lawful right to do, regardless of whether it obstructs or hinders a police officer."

State v. Jarvis, 172 W. Va. 706, 709 (1983).  Accordingly, in Massachusetts, the offense of interference with a police officer requires proof of a physical act that obstructs or hinders a police officer in the lawful performance of his or her duty.  It also may include a "threat[] of violence against" the officer, see § 17 of chapter 29 of the 1844 Report, which reasonably would have the effect of obstructing or interfering with the officer in the performance of a lawful duty.[10]

Although each case turns on its own facts, because there could be endless scenarios surrounding police interactions with citizens where an officer might contemplate charging this offense, we illustrate the type of conduct prohibited by the common-law crime of interference with a police officer by examining a civil rights action that was commenced in a Federal District Court.  In that case, the plaintiff owned property in Falmouth that included an easement deeded to an electrical utility.  Wilber v. Curtis, 872 F.3d 15, 17 (1st Cir. 2017).  Pursuant to the easement, the utility was entitled to enter the plaintiff's property to trim, cut, or remove trees and

---

[10] See, e.g., Gay v. State, 179 Ga. App. 430, 431-432 (1986) (evidence of obstruction sufficient where defendant threatened to get his shotgun and "blow holes in the patrol car" of officer who had called for truck to tow defendant's vehicle); State v. Mattila, 77 Or. App. 219, 221, 223 (1986) (obstructing governmental function established by evidence that defendant asked his mother, in loud voice, whether he could shoot deputies who had approached house to serve eviction papers).

underbrush that endangered its power lines. Id. As a result of an earlier confrontation with the plaintiff, a tree service contracted by the utility to clear vegetation entered the easement, accompanied by two Barnstable police officers. Id. When he saw the work crew, the plaintiff went into "a high state of agitation," verbally protested, and strung yellow caution tape and plastic rope across the easement. Id. at 18. The police officers and utility workers removed some of the tape and rope, causing further delays. Id. The officers told the plaintiff that the work would not stop absent a court order, and warned him to cease interfering with the project. Id. Despite the warning, the plaintiff sat down on a tree stump and refused to move. Id. The officers then arrested him for disorderly conduct. Id.

The plaintiff later filed a complaint asserting claims against the officers for civil rights violations under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act, false arrest, false imprisonment, and intentional infliction of emotional distress, and other claims. Id. On appeal from a magistrate judge's decision, the United States Court of Appeals for the First Circuit upheld the allowance of a motion for summary judgment by the police on qualified immunity grounds, and concluded that the officers had had probable cause to arrest the plaintiff for the Massachusetts common-law offense of

interference with a police officer. Id. at 21-22. The court reasoned that the officers had been engaged in the performance of the lawful duty of keeping citizens away from a dangerous work area, and the plaintiff had obstructed or hindered them by blocking the work crew. Id.

Accordingly, the offense of interference with a police officer requires the Commonwealth to prove four elements beyond a reasonable doubt. First, the Commonwealth must show that the officer was engaged in the lawful performance of a duty. Second, the Commonwealth must establish that the defendant physically performed an act that obstructed or hindered a police officer in the lawful performance of that duty. The act may include a "threat[] of violence against" the officer, see § 17 of chapter 29 of the 1844 Report, which reasonably would have the effect of obstructing or hindering the officer in the performance of that duty. Third, the Commonwealth must demonstrate that the defendant was aware that the police officer was engaged in the performance of his or her duties. Fourth, the Commonwealth must prove that the defendant intended to obstruct or hinder the officer in the performance of that duty.

c. Sufficiency of the evidence. The defendant challenges on two grounds the sufficiency of the evidence that his refusal to turn over his firearms interfered with the police officers who had come to his house to collect them. First, the defendant

disputes whether the officers were acting within the lawful performance of a duty when they confiscated his firearms and ammunition. According to the defendant, G. L. c. 140, §§ 129D and 131 (f), authorize the police to serve an individual with notice of a firearm license suspension or revocation. Under the defendant's interpretation, the individual would be permitted to maintain possession of his or her firearms and ammunition pending judicial review of the decision to suspend or revoke. The defendant maintains that "[a]nything that occurred after the [notification of license suspension or revocation] could not be considered interference with the lawful performance of [the officers'] duty." Second, the defendant contends that his refusal to surrender his firearms and ammunition was not sufficient, without more, to support a conviction of common-law interference with a police officer.

The Commonwealth argues that the jury were entitled to find that "the officers' duty encompassed not only the serving of the notice [of license suspension or revocation] but also the seizing of the weapons -- and that the defendant interfered with that duty."

In Massachusetts, local police departments are responsible for the issuance of firearms licenses to individuals who reside or have a place of business within the jurisdiction. G. L. c. 140, §§ 121, 129B (1). As relevant to license suspension,

G. L. c. 140, § 131 (f), provides, "All licenses to carry firearms shall be designated [c]lass A or [c]lass B, and the issuance and possession of any such license shall be subject to the following conditions and restrictions:"

> "A license issued under this section shall be revoked or suspended by the licensing authority, or his designee, upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such a license renewed. A license may be revoked or suspended by the licensing authority if it appears that the holder is no longer a suitable person to possess such license. Any revocation or suspension of a license shall be in writing and shall state the reasons therefor."

A license holder who is aggrieved by a suspension or revocation may seek judicial review in the District Court within ninety days of the revocation or suspension. Id. Upon the revocation or suspension of a class A or class B license, "the licensing authority shall take possession of such license and the person whose license is so revoked or suspended shall take all actions required under the provisions of [§] 129D." Id. General Laws c. 140, § 131 (f), further provides that "[n]o appeal or post-judgment motion shall operate to stay such revocation or suspension." Id. See Firearms Records Bureau v. Simkin, 466 Mass. 168, 172-173 (2013). See also Hightower v. Boston, 693 F.3d 61, 67 (1st Cir. 2012).

General Laws c. 140, § 129D, on the other hand, contains provisions that on their face may appear inconsistent with the requirements of c. 140, § 131 (f). General Laws c. 140, § 129D,

provides that a firearm license holder "[u]pon revocation . . . [or] suspension . . . shall without delay deliver or surrender to the licensing authority where the person resides all firearms, rifles, shotguns and machine guns and ammunition which the person then possesses unless an appeal of the revocation or suspension is pending."  Thereafter, the licensing authority is responsible for properly storing and (potentially) disposing of the firearms.  Id.  See Andrade v. Somerville, 92 Mass. App. Ct. 425, 428 (2017).

As the defendant points out, there indeed is a tension between these statutory provisions.  General Laws c. 140, § 131 (f), requires the police to take possession of the revoked or suspended firearms license, and states, "No appeal or post-judgment motion shall operate to stay such revocation or suspension."  General Laws c. 140, § 129D, on the other hand, requires a license holder immediately to surrender all firearms and ammunition to the police "unless an appeal of the revocation or suspension is pending."

"Where possible, we seek to harmonize the provisions of a statute with related provisions that are part of the same statutory scheme 'so as to give effect to the expressed intent of the Legislature'" (citation omitted).  Chin v. Merriot, 470 Mass. 527, 537 (2015).  Massachusetts courts consistently have noted that the underlying goal of firearms control legislation

"is to limit access to deadly weapons by irresponsible persons." Simkin, 466 Mass. at 176, quoting Ruggiero v. Police Comm'r of Boston, 18 Mass. App. Ct. 256, 258 (1984). This purpose is effectuated by the provision that "[n]o appeal or post-judgment motion shall operate to stay" a revocation or suspension, and the requirement that the license holder surrender his or her firearms and ammunition "without delay." See G. L. c. 140, §§ 129D, 131 (f).

The two statutes may be harmonized so that they form a coherent and consistent whole and the phrase "unless an appeal . . . is pending" in G. L. c. 140, § 129D, is understood consistent with legislative intent and constitutional protections. See Commonwealth v. Harris, 443 Mass. 714, 725 (2005), quoting LaBranche v. A.J. Lane & Co., 404 Mass. 725, 728 (1989) ("[W]e should endeavor to harmonize the two statutes so that the policies underlying both may be honored. Implied repeal of a statute is disfavored, and we should not impliedly repeal a portion of [the statute] unless it 'is so repugnant to, and inconsistent with, the later enactment . . . that both cannot stand'"). See also Ciani v. MacGrath, 481 Mass. 174, 179 (2019) (court strives to give effect to each word of statute so no part will be inoperative).

To harmonize the provisions of G. L. c. 140, §§ 129D and 131 (f), and give effect to each word, we conclude that the

provisions afford a licensing authority two options when seeking to implement the suspension or revocation of a license for an individual deemed potentially "unsuitable."  See G. L. c. 140, § 131 (d).

First, the licensing authority has discretion to provide notice to an individual believed no longer to be suitable to possess a license, and to seek immediate surrender of that individual's license, firearms, and ammunition.[11]  The failure to surrender firearms "without delay," in these circumstances, could subject the license holder to criminal sanctions pursuant to G. L. c. 269, § 10 (i).[12]  Thus, a licensing authority may

---

[11] A license to possess a firearm "shall be revoked or suspended by the licensing authority . . . upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed."  G. L. c. 140, § 131 (f).  See District of Columbia v. Heller, 554 U.S. 570, 626 (2008) (right to bear arms is not unlimited; individual may be statutorily disqualified from holding firearms license, on grounds of unsuitability, without violation of Second Amendment); Hightower, 693 F.3d at 73-76 ("unsuitable" individual, such as felon or one who is mentally ill, is not denied due process by revocation of firearms license).

[12] Here, the defendant refused to allow police to enter his home.  A District Court judge properly found that the officers were required to obtain a search warrant prior to seizing the firearms, because the Commonwealth was unable to establish consent or another exception to the warrant requirement.  See Commonwealth v. Rogers, 444 Mass. 234, 236-237 (2005).  In such circumstances, if they deem it necessary, police may secure the premises from the outside while they await the issuance of a search warrant.  See Commonwealth v. Yesilciman, 406 Mass. 736, 743 (1990).  See also Commonwealth v. Blake, 413 Mass. 823, 829 (1992) (securing dwelling, on basis of probable cause to search for evidence of crime, includes ability to prevent anyone from

seek immediate surrender, prior to a hearing, of firearms in such cases. See G. L. c. 140, §§ 129D, 131 (f).

Although the statute is less than clear, the Legislature could not have intended to permit firearms to remain in the possession of dangerous individuals during a ninety-day appeal period, and then during the possibly lengthy duration of any subsequent appeal. See United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011), cert. denied, 565 U.S. 1204 (2012), quoting United States v. Hayes, 555 U.S. 415, 427 (2009) ("Statistics bear out the [United States] Supreme Court's observation that '[f]irearms and domestic strife are a potentially deadly combination nationwide'"); Chief of Police of Worcester v. Holden, 470 Mass. 845, 864 (2015). See also United States v. Reese, 627 F.3d 792, 800-805 (10th Cir. 2010), cert. denied, 563 U.S. 990 (2011) (applying intermediate scrutiny and upholding statute that precludes those subject to abuse prevention order from having firearms); United States v. Skoien, 614 F.3d 638, 641-645 (7th Cir. 2010), cert. denied, 562 U.S. 1303 (2011) (noting Court's holding in Heller "means that some categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established

---

entering dwelling and potentially accessing evidence to be seized).

by evidence presented in court," and upholding revocation of license, using intermediate scrutiny, for one convicted of "misdemeanor crime of domestic violence").

Second, the licensing authority may, in the exercise of its discretion, notify the license holder of a revocation or suspension without seeking immediate surrender of any firearms. In such an instance, the commencing of an appeal would stay the obligation to surrender firearms "without delay."  See Hightower, 693 F.3d at 68-69.

Here, the defendant received written, in-hand service of the suspension of his class A license.  The suspension was based upon a report filed by the Department of Children and Families alleging that the defendant had injured his wife and that their son was at home at the time of the alleged incident.  Where the police officers demanded that the defendant surrender his firearms because he was no longer believed to be a suitable person, the defendant thereupon was required immediately to surrender his license, firearms, and ammunition.[13]  Thus, the

---

[13] The defendant argues that the failure to provide a "safe harbor" period for the surrender of firearms violated his constitutional right to bear arms as guaranteed by the Second Amendment, and right to the due process of law.  We disagree. The United States Supreme Court has explained that "the right secured by the Second Amendment is not unlimited."  Heller, 554 U.S. at 626.  Accord McDonald v. Chicago, 561 U.S. 742, 786 (2010).  Thus, it "is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" McDonald, supra, quoting Heller, supra.  The Supreme Court has

jury were entitled to find that the police were acting in the lawful performance of their duties when they demanded that the defendant surrender firearms he was no longer deemed suitable to possess.

Nonetheless, although the defendant's refusal to surrender his firearms and ammunition may have violated G. L. c. 269, § 10 (i), his noncompliance with the demand that he surrender his firearms cannot form the basis of a charge of common-law interference with a police officers.  The jury were entitled to find, in the light most favorable to the Commonwealth, that the defendant was upset and argumentative.  He insisted that he would not comply with the police order, repeatedly demanded to contact his lawyer, and told his wife not to allow the police to enter their home.  The Commonwealth did not, however, establish that the defendant physically obstructed or hindered the officer in the performance of a lawful duty.  Moreover, the defendant's

---

stated that "prohibitions on the possession of firearms" by certain classes of people, including "felons and the mentally ill," are among the nonexhaustive "list" of "presumptively lawful" regulations a State may adopt.  Heller, supra at 626-627 & n.26.  Here, the police suspended the defendant's license to carry a firearm due to a report of spousal abuse.  In light of concomitant safety concerns, the police were entitled to take affirmative steps to avert potential harm.  See Hightower, 693 F.3d at 84 ("unsuitable" license holder not deprived of due process by absence of predeprivation hearing).  After the surrender of his firearms, the defendant had the opportunity to seek judicial review within ninety days of the suspension. G. L. c. 140, § 131 (f).

protestations did not rise to the level of threats of violence against a police officer, which reasonably would have the effect of obstructing or interfering with the police in the performance of a lawful duty.

Accordingly, the evidence was insufficient to sustain the conviction of interference with a police officer.

3.  Conclusion.  The judgment of conviction of interference with a police officer is vacated and set aside.  The matter is remanded to the District Court for entry of a judgment of not guilty.

So ordered.

## Appendix A.

## Cases charging interference with a police officer

| Year Charged | Number of Charges |
|:---:|:---:|
| 1977 | 1 |
| 1981 | 1 |
| 1982 | 2 |
| 1985 | 1 |
| 1986 | 1 |
| 1987 | 3 |
| 1988 | 3 |
| 1989 | 4 |
| 1990 | 4 |
| 1991 | 2 |
| 1992 | 7 |
| 1993 | 8 |
| 1994 | 27 |
| 1995 | 35 |
| 1996 | 30 |
| 1997 | 38 |
| 1998 | 25 |
| 1999 | 37 |
| 2000 | 60 |
| 2001 | 42 |
| 2002 | 55 |
| 2003 | 42 |
| 2004 | 44 |
| 2005 | 53 |
| 2006 | 53 |
| 2007 | 59 |
| 2008 | 53 |
| 2009 | 69 |
| 2010 | 66 |
| 2011 | 128 |
| 2012 | 99 |
| 2013 | 164 |
| 2014 | 236 |
| 2015 | 248 |
| 2016 | 285 |
| 2017 | 280 |
| 2018 | 335 |

Appendix B.


Cases where interfering with a police officer
was the highest offense charged


| Year Charged | Number of Charges |
|:---:|:---:|
| 2002 | 12 |
| 2003 | 11 |
| 2004 | 14 |
| 2005 | 11 |
| 2006 | 13 |
| 2007 | 13 |
| 2008 | 10 |
| 2009 | 12 |
| 2010 | 18 |
| 2011 | 9 |
| 2012 | 13 |
| 2013 | 11 |
| 2014 | -- |
| 2015 | -- |
| 2016 | -- |
| 2017 | -- |
| 2018 | -- |