## COMMONWEALTH vs. SHAWN P. JOYCE.

No. 12-P-1380.

Essex. September 17, 2013. - November 26, 2013.

Present: KAFKER, TRAINOR, & MALDONADO, JJ.

*Arrest. Resisting Arrest. Evidence,* Intent. *Intent. Wilful, Wanton, or Reckless Conduct. Fire Fighter.*

At the trial of a criminal complaint charging, inter alia, wilful interference with a fire fighting operation, in violation of G. L. c. 268, § 32A, evidence of the defendant's defiance of a police order not to reenter his burning home and his subsequent refusal to leave, which resulted in a physical struggle with the fire chief and a police officer, was sufficient to sustain the defendant's conviction, in that there was no dispute that the fire chief was engaged in the lawful performance of his duties; evidence of actual interference, obstruction, or hindrance of the fire chief was overwhelming; there was sufficient evidence that such interference, obstruction, or hindrance was wilful; and the defendant's statements and actions supported findings of deliberate defiance rather than a frantic preoccupation with saving his animals. [577-580]

At the trial of a criminal complaint charging, inter alia, resisting arrest, in violation of G. L. c. 268, § 32B, there was sufficient evidence to sustain the defendant's conviction, in that the police told the defendant he was under arrest and the defendant used physical force in an attempt to prevent the police from effecting the arrest. [581-582]

COMPLAINT received and sworn to in the Newburyport Division of the District Court Department on April 13, 2011.

The case was heard by *Michael A. Uhlarik,* J.

*Leslie B. Salter* for the defendant.

*Paul C. Wagoner,* Assistant District Attorney, for the Commonwealth.

KAFKER, J. After shouting obscenities at the fire chief and police officers responding to a fire at his home, ignoring their orders, and wrestling with them inside the burning building, the defendant, Shawn P. Joyce, was convicted of wilfully interfering with a fire fighter in the performance of his duty, see G. L.

c. 268, § 32A, and resisting arrest, see G. L. c. 268, § 32B. He argues on appeal that there was insufficient evidence for the judge to find him guilty of either offense. We affirm.

*Background.* The evidence at the bench trial was as follows. At about 8:00 P.M. on April 12, 2011, neighbors discovered a fire at 69 Pearson Drive in the Byfield section of Newbury, where the defendant lived with his mother (Barbara Joyce), his dog, and several "feral cats." The blaze already had engulfed at least one side of the home, and flames were rising fifty feet high. After telephoning 911, two neighbors, one of whom was a nurse, ran to the house, calling out to determine whether the defendant and his mother were safe. These neighbors found the defendant and his mother outside the house and witnessed him cursing and pounding the trunk of his car. When the neighbors managed to attract the defendant's attention, he shouted threats and profanity at them and chased them off the property.

Shortly thereafter, Newbury police Officer Stephen Smith arrived at the burning home.[1] As Smith walked up the driveway, the defendant briskly approached him and began swearing at him and blaming him for a number of misfortunes, including the likely death of family pets in the fire. Observing that the defendant was out of control, Smith ordered him to stay back. The defendant responded by continuing to shout obscenities and by walking back toward the house. Despite the officer's repeated warnings to keep away from the burning building, the defendant declared he was going to get more animals and went inside, as did his mother.

Newbury fire Chief William Pearson (fire chief or Pearson) arrived at the scene in his private vehicle at 8:14 P.M., just before the defendant's reentry into the house. Pearson's first task normally would have been to assess the condition of the building and the extent of the fire in order to develop a strategy to fight it. However, he was immediately concerned for the safety of the defendant and his mother as Pearson had been told that they were in the house. The fire chief wanted to avoid risking the lives of other fire fighters who later might need to go

---

[1] Smith left his cruiser's emergency lights on and was wearing his full regulation uniform.

inside the building to rescue them. In addition, the available methods of fighting the fire would be reduced if anyone were in the building. Already dressed in his fire fighting gear, Pearson entered the house. He found the defendant standing near a washing machine and dryer in a basement-type room. Smoke already was filling the upper half of the room, and burning embers were coming through the floor above them.

Pearson promptly ordered the defendant to leave the building. The defendant responded by putting up his finger and saying, "F-U, I am not leaving this building. I should have called the water department first; they would have got here faster." The defendant ignored further orders to depart and continued swearing at the fire chief. Pearson eventually grabbed him and attempted to push him out the door. The defendant struggled with the fire chief, pushed him back, and twisted away from him. Officer Smith, who was still outside, saw that the two men might end up on the floor wrestling each other, so he entered the room, placed the defendant in a modified headlock, and dragged him outside. The fire chief and the defendant's mother followed. In total, Pearson spent about four minutes in the home with the defendant.

Once outside, Smith ordered the defendant to wait beside a vehicle in the driveway while the officer stood nearby attending to other duties. With the building clear of people, Pearson resumed assessing the fire situation and began directing the fire crews, who had just arrived.

Several minutes later, the fire chief confronted the defendant about what had happened inside, and the defendant began a new eruption of obscenities and threatening behavior. By that time, Newbury police Officer Michael Croteau had reached the scene. He directed the fire chief away and several times ordered the defendant to stop. When the defendant did not relent, Croteau placed the defendant's right arm behind his back in an armlock and told him to put his hands behind his back because he was under arrest. The defendant still did not stop shouting and instead struggled to pull his arms forward and maintain a fighting stance with the fire chief. Smith had to help Croteau turn the defendant

toward an adjacent vehicle, turn his face away from them,[2] and bring his left hand back far enough to place him in handcuffs — a process that required about thirty seconds. Because the defendant still was tensing his arms, the officers had to use two sets of handcuffs to bridge the gap between his wrists. As the officers escorted the defendant to a cruiser parked along the street, he continued to work against them, refusing to move his feet, pushing backwards, and straining to turn in order to shout threats and insults at bystanders.

*Discussion.* The defendant argues that the evidence presented at trial was insufficient to support findings of guilt of either wilfully interfering with a fire fighting operation or resisting arrest.[3] When reviewing a challenge to the sufficiency of the evidence, we "consider the evidence in the light most favorable to the Commonwealth to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Cordle*, 412 Mass. 172, 175 (1992). We review questions of law de novo. *Commonwealth* v. *George W. Prescott Publishing Co., LLC*, 463 Mass. 258, 264 n.9 (2012).

1. *Wilful interference with fire fighting operation.* According to G. L. c. 268, § 32A, as appearing in St. 1968, c. 82:

> "Whoever willfully obstructs, interferes with or hinders a fire fighter in the lawful performance of his duty, or whoever willfully obstructs, interferes with or hinders a fire fighting force in the lawful performance of its duty, shall be punished by a fine of not less than one hundred nor more than one thousand dollars or by imprisonment in a jail or house of correction for not less than thirty days nor more than two and one half years or by imprisonment in the state prison for not more than five years, or by both such fine and imprisonment in a jail or house of correction."

We turn directly to the plain language of the statute to determine its meaning. We note further that there is no appellate

---

[2]Smith was using one hand to turn the defendant's head to ensure the defendant would be unable to spit on them.

[3]The defendant did not move for required findings of not guilty at trial.

case law interpreting it. Compare *Commonwealth* v. *Perella*, 464 Mass. 274, 276 (2013). The statute penalizes a defendant who wilfully obstructs, interferes with, or hinders a fire fire-fighter in the lawful performance of his duties. The term " 'wilful' means intentional and by design in contrast to that which is thoughtless or accidental." *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 443 (1983). See *Commonwealth* v. *Armand*, 411 Mass. 167, 170 (1991). In addition, wilfulness requires "a showing that the defendant intended both the conduct *and* its harmful consequences" (emphasis supplied). *Ibid.* In the statute, the word "wilfully" modifies the words "obstructs, interferes with or hinders." Thus, by its plain terms, the statute punishes the intentional interference, obstruction, or hindrance of a fire fighter in the lawful performance of his duties. We interpret this language to mean that the defendant must intend not just his conduct, but the harmful consequences of the conduct — that is, the interference with, obstruction, or hindrance of the fire fighter.[4] See *Commonwealth* v. *Schuchardt*, 408 Mass. 347, 352 (1990). See also *Commonwealth* v. *Stephens*, 25 Mass. App. Ct. 117, 121-122 (1987) (similar language in G. L. c. 265, § 37, required intent to cause prohibited consequences of one's acts). Indeed, the express language and the design of the statute make clear that it is the interference, obstruction, or hindrance itself that must be intended.

In the instant case, we have no difficulty concluding that a rational trier of fact could have found beyond a reasonable doubt that the defendant wilfully interfered with, obstructed, or hindered the fire chief in the lawful performance of his duties.

---

[4]We stress this distinction to emphasize that G. L. c. 268, § 32A, does not criminalize all intentional acts that result in interference with a fire fighting operation regardless of whether the actor intends that result. Undoubtedly, fire-related emergencies often will be tense situations that stoke heightened emotions and reactions. The discovery that one's home is burning may incite those involved to act without thinking through the consequences. In these situations, a person's desperate, intentional conduct might unintentionally interfere with the work of professionals trained and equipped to extinguish the blaze. For example, an anguished parent might run into her home to attempt to rescue a child without even contemplating that her actions hinder fire fighters' performance of their duties, much less intend that interference. In that situation, the statute would not apply because it condemns only those acts for which interference, obstruction, or hindrance actually is intended.

There is no dispute that the fire chief was engaged in the lawful performance of his duties. There also is overwhelming evidence of the actual interference, obstruction, or hindrance. The struggle to remove the defendant from the building delayed the performance of Pearson's duty to make an initial assessment of the fire and his duty to secure the scene. Moreover, even if the fire chief had elected to fully assess the situation before bringing the defendant out of the house, as the defendant suggests he could have, the presence of persons inside would have injected substantial uncertainty into Pearson's planning, and would have limited his methods of fighting the fire. Finally, the defendant's physical resistance to removal hindered the fire chief's important duty to ensure the safety of everyone involved, including the defendant himself.

There also was more than sufficient evidence in the trial record to establish beyond a reasonable doubt that the interference, obstruction, or hindrance was wilful. The defendant's words and deeds clearly demonstrate such intention. See *Commonwealth* v. *Lauzier*, 53 Mass. App. Ct. 626, 629 (2002) (intent may be inferred "from the circumstances attending the act, and from the conduct and declarations of the defendant"), quoting from *Commonwealth* v. *Perron*, 11 Mass. App. Ct. 915, 917 (1981). See also *Parreira* v. *Commonwealth*, 462 Mass. 667, 673 (2012) (fact finder entitled to rely on objective circumstances surrounding defendant's acts to determine intent). When the fire chief ordered the defendant to leave the burning building, the defendant said, "F-U, I am not leaving this building." He ignored further orders to leave the building, while continuing to swear at the fire chief, and then wrestled with the fire chief when he tried to remove the defendant as the fire burned around them. The defendant was so determined to fight removal that he and the fire chief were close to falling to the floor. It was only through Officer Smith's intervention that the defendant eventually was brought out of the building.

The defendant argues nonetheless that when he reentered the home and refused to leave, he merely intended to save his pets and did not wilfully interfere with the ongoing firefighting operation. The simple answer to this contention is that on appeal we must consider the evidence in the light most favorable

to the Commonwealth, and the defendant's intention is a question for the fact finder. As emphasized by the trial judge at sentencing, the defendant had opportunities to search for his pets before emergency workers arrived. Instead, he spent those precious minutes shouting profanity and threats outside the home. Only after a police officer ordered him to stay away from the house did the defendant reenter. When the fire chief ordered the defendant to come out, he defiantly stated that he was not going to leave the building. He did not suggest that he needed more time, and there was no evidence that he frantically was trying to save his pets. His statements and actions support findings of deliberate defiance rather than frantic preoccupation with saving his animals.

Moreover, multiple or mixed motives make no difference in this context. The statutory requirements are satisfied if a defendant intends to interfere, obstruct, or hinder a fire fighter in the lawful performance of his duties, even if the defendant has other intentions as well. See *Commonwealth* v. *Guisti*, 434 Mass. 245, 248-249 (2001) (in brandishing knife, "defendant may have intended to commit suicide *and at the same time* intended to harm the victim or engender fear in the victim that he would harm her"); *Commonwealth* v. *Lauzier*, 53 Mass. App. Ct. at 630 (evidence of "dual intent" did not compel fact finder to accept defendant's noncriminal purpose and ignore his felonious purpose).[5] See also *Commonwealth* v. *Rosario*, 83 Mass. App. Ct. 640, 643 (2013) (although defendant may have threatened witness as a result of longstanding animosity, this would not preclude inference that defendant also intended to intimidate witness through his acts). In the light most favorable to the Commonwealth, there was undoubtedly sufficient evidence to allow the judge to find beyond a reasonable doubt that the defendant acted with the intent to interfere with the fire chief's performance of his duties, not just with the intent to save the defendant's pets.

[5]The defendant relies on cases interpreting G. L. c. 272, § 53, which makes being a disorderly person a criminal offense. There, the absence of legitimate purpose is deemed an express requirement by the Model Penal Code and is necessary to avoid problems under the First Amendment to the United States Constitution. See *Commonwealth* v. *Feigenbaum*, 404 Mass. 471, 474 (1989). No such express requirement is present or required here.

2. *Resisting arrest.* "A person commits the crime of resisting arrest if he knowingly prevents or attempts to prevent a police officer, acting under color of his official authority, from effecting an arrest of the actor . . . by: (1) using or threatening to use physical force or violence against the police officer or another; or (2) using any other means which creates a substantial risk of causing bodily injury to such police officer or another." G. L. c. 268, § 32B, inserted by St. 1995, c. 276. "[T]he crime is committed, if at all, at the time of the 'effecting' of an arrest." *Commonwealth* v. *Grandison,* 433 Mass. 135, 145 (2001). An arrest occurs when there is (1) "an actual or constructive seizure or detention of the person," (2) "performed with the intent to effect an arrest," and (3) is "so understood by the person detained." *Commonwealth* v. *Grant,* 71 Mass. App. Ct. 205, 208 (2008). "The standard for determining whether a defendant understood that he was being arrested is objective — whether a reasonable person in the defendant's circumstances would have so understood." *Ibid.*

In the instant case, Officer Croteau told the defendant multiple times to back off from his confrontation with the fire chief. When the defendant refused, the officer placed the defendant's right arm behind his back and told him he was under arrest. The defendant continued to resist thereafter, shouting and struggling to pull his arms forward to maintain a fighting stance with the fire chief. As the officers tried to escort him to the cruiser, he refused to move his feet, pushing backwards and straining to turn so that he could shout at bystanders. The evidence was sufficient to allow a finding beyond a reasonable doubt that the defendant used physical force against Officers Croteau and Smith to attempt to prevent them from effecting the arrest. See *Commonwealth* v. *Grandison,* 433 Mass. at 144-145; *Commonwealth* v. *Katykhin,* 59 Mass. App. Ct. 261, 262-263 (2003); *Commonwealth* v. *Maylott,* 65 Mass. App. Ct. 466, 468-469 (2006).

Nonetheless, the defendant argues that even if he struggled against police officers' efforts to place him in custody, he did not *knowingly* resist arrest. During the arrest, Croteau ordered the defendant to put his hands behind his back, took hold of and immobilized his right arm, and *told him* that he was under

arrest. The trial judge could have found that a reasonable person in the defendant's circumstances would have known he was being arrested. See *Commonwealth* v. *Grandison*, 433 Mass. at 146.

*Judgments affirmed.*