NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13531

COMMONWEALTH  vs.  MARYANN RUSSO.


Norfolk.      March 6, 2024. - July 15, 2024.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Georges,
& Dewar, JJ.


Animal.  Dog.  Practice, Criminal, Dismissal.  Probable Cause.
    Statute, Construction.



    Complaint received and sworn to in the Quincy Division of
the District Court Department on February 10, 2021.

    A motion to dismiss was heard by John P. Stapleton, J.

    After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.


    Tracey A. Cusick, Assistant District Attorney, for the
Commonwealth.
    Jason S. Bolio (Michael J. Santomaro also present) for the
defendant.
    The following submitted briefs for amici curiae:
    Martha Smith-Blackmore & Lenore M. Montanaro, pro se.
    Kathleen M. Wood & Jessica A. Chapman, of Oregon, & Debora
Newman for Animal Legal Defense Fund & another.
    Jamie Falzone, pro se.
    Ann Grant, Committee for Public Counsel Services, for
Committee for Public Counsel Services.
    Allison Blanck & Lynsey M. Legier for Animal Rescue League
of Boston & another.

GAZIANO, J.  This case raises the issue whether a failure to follow a veterinarian's recommendation to euthanize a pet, and instead bring the pet home to die, violates the animal cruelty statute, G. L. c. 272, § 77.  The charge against the defendant, Maryann Russo, arises from her care of Tipper, her then terminally ill fourteen year old cocker spaniel.  The defendant brought Tipper to a veterinarian seeking to have a large necrotic mass removed from Tipper's side.  Observing the extent of Tipper's illnesses, including bed sores and open wounds, the veterinarian informed the defendant that Tipper would not survive surgery.  The veterinarian recommended euthanasia because, in her opinion, Tipper was terminally ill and nothing could be done to manage his pain.  The defendant falsely promised to bring Tipper to a different veterinary practice to be euthanized and took Tipper home to die.  A few weeks later, prompted by the veterinarian's suspicions about the defendant's intentions, the Animal Rescue League (ARL) removed Tipper from the defendant's care.  Tipper, by this point, was close to death, with a distended stomach and periodic, shallow breathing.

A criminal complaint issued against the defendant charging her under a portion of the animal cruelty statute that prohibits "knowingly and willfully authoriz[ing] or permit[ting] [an

animal] to be subjected to unnecessary torture, suffering or cruelty of any kind." G. L. c. 272, § 77. The defendant filed a motion to dismiss the complaint, which was allowed by a District Court judge. The Appeals Court affirmed the dismissal of the complaint. See Commonwealth v. Russo, 103 Mass. App. Ct. 319, 324 (2023). We allowed the Commonwealth's application for further appellate review and now affirm the judge's order. For the reasons that follow, we conclude that there was insufficient evidence of criminal intent to sustain a charge of animal cruelty.[1]

Background. 1. Facts. We recite the relevant facts from the application for criminal complaint. See Commonwealth v. Ilya I., 470 Mass. 625, 626 (2015).

On December 25, 2020, the defendant brought Tipper[2] to the VCA South Shore Animal Hospital (animal hospital). A veterinarian attended to Tipper and observed a large mass on his

---

[1] We acknowledge the amicus briefs submitted in support of the Commonwealth by Martha Smith-Blackmore and Lenore M. Montanaro; the Animal Legal Defense Fund and the Association of Prosecuting Attorneys; Jamie Falzone; and the Animal Rescue League of Boston and the Massachusetts Society for the Prevention of Cruelty to Animals. We also acknowledge the amicus brief submitted in support of the defendant by the Committee for Public Counsel Services.

[2] The defendant asserts in her brief that the dog's name is misstated throughout the record as Chipper when it was in fact Tipper.

side.  She recommended surgery to remove the mass.  The defendant declined the surgery and took Tipper home.

About three weeks later, on January 13, 2021, the defendant again brought Tipper to the animal hospital.  This time, the veterinarian observed that Tipper not only had a "large necrotic mass," but also had bed sores and an "open necrotic wound" where his skin was "sloughing off."  Additionally, Tipper was unable to walk or stand, appeared anemic, and exhibited significant pain with labored breathing.  Based on Tipper's condition, the veterinarian advised the defendant that there was nothing that could be done to control Tipper's pain and recommended euthanasia.  In response, the defendant requested the surgery that the veterinarian previously had recommended on December 25.  The veterinarian explained that Tipper was unlikely to survive surgery.  The defendant claimed that she would have a different veterinarian euthanize Tipper and took him home.

Despite the defendant's statement that she would take Tipper elsewhere, "[the veterinarian] did not believe that the [defendant] would do this based on [the defendant's] history at [the animal hospital]."  Concerned by Tipper's pain and his need for supplemental oxygen, the veterinarian contacted the ARL the

following day to report her interaction with the defendant.[3]  In her report, the veterinarian explained to the ARL that the defendant removed her dog from the animal hospital against medical advice.

After the veterinarian's initial report, Sergeant Paul Parlon, a special State police officer with the ARL, was assigned to the case.[4]  Parlon made several unsuccessful attempts to contact the defendant.  He left notices at the defendant's home and messages on the defendant's telephone.  On January 15, 2021, one day after the veterinarian's report, Parlon received a voice mail message from the defendant.  The defendant stated that Tipper was in good health and pain free.  Asserting that Tipper had returned to his normal behavior, the defendant reported that he was once again eating, drinking, getting off the couch, and "going [to] the bathroom."  Given Tipper's improved health, the defendant explained that she did not plan to euthanize him.  Although the defendant provided her telephone number, she did not respond after Parlon left her a voice mail message stating that he needed to see Tipper.

---

[3] There are no allegations in the complaint application that the veterinarian advised the defendant of Tipper's need for supplemental oxygen.

[4] See G. L. c. 22C, § 57 (providing for appointment of agents of certain animal welfare organizations as "special state police officers" with "the powers of constables and police officers" to enforce animal cruelty prevention laws).

On February 4, 2021, Parlon returned to the defendant's residence, but she was not home. The defendant's mother asked if Parlon was there because of Tipper. After Parlon answered affirmatively, the defendant's mother assured him that the dog was "ok," and invited Parlon into the home. The defendant's mother led Parlon to a room where the officer observed Tipper on a couch, lying on a "bed-like linen," surrounded by newspapers, and next to a large religious statue. Tipper was also wearing a diaper.

On first seeing Tipper lying on his side, Parlon believed that "the dog appeared to be deceased," because Tipper's legs "looked stiff and there appeared to be no sign of breathing." On closer inspection, Parlon saw that Tipper was taking "shallow periodic breaths." Tipper appeared thin but with a distended stomach. Parlon also observed the "raw-looking sores on [the dog's] front and back right [l]egs" that the veterinarian had described in her initial report.

After inspecting Tipper, Parlon told the defendant's mother that Tipper needed immediate medical intervention. Although the defendant's mother insisted that Tipper was in "good shape" and doing "much better," Parlon maintained that Tipper was "extremely ill" and dying. The defendant's mother asked Parlon not to put these observations in his report and asserted

repeatedly that Parlon would not "tak[e] [her] dog" and that Tipper would "die at home."

To observe the mass that the veterinarian had reported, Parlon requested to see Tipper's left flank. The defendant's mother complied, flipping Tipper so that his left side was facing up. As Tipper was turned, he appeared stiff and uncomfortable, gasping for air. Once turned, Parlon was able to observe a large mass on Tipper's side, consistent with the veterinarian's report. When Parlon remarked on Tipper's labored breathing, the defendant's mother returned Tipper to his original position on his right side and said, "There, see, he is fine."

At this point, the defendant's father expressed frustration with Parlon, stating, "[I am] sick of this America that lets people kill dogs . . . . All I do is love my dog." Parlon assured the defendant's father that he did not question whether the father was dedicated to Tipper but explained that Tipper was "suffering and clearly [the defendant's family was] aware of that."

Parlon was led to the kitchen, where the defendant's mother showed him a bag containing loose pills and pill bottles. She stated that the bag contained pain medication for Tipper but

claimed that Tipper no longer needed them.[5]  Parlon reiterated that Tipper was "clearly suffering" and needed immediate medical intervention.  The defendant's mother insisted that Parlon should not put that information in his report.

After explaining to the defendant's family that Parlon would be filing a report and seeking a court order to ensure Tipper received medical care, Parlon was asked to leave.  As he left, Parlon was told he was not allowed back.[6]

2.  Procedural history.  In February 2021, a criminal complaint issued from the Quincy Division of the District Court charging the defendant with violating the animal cruelty statute, G. L. c. 272, § 77.

In January 2022, the defendant filed a motion to dismiss, asserting that the complaint lacked probable cause.  She amended her motion in March 2022.  During a hearing on the defendant's motion, the Commonwealth indicated that it was not proceeding on a theory "that the defendant had to euthanize the dog," but rather that the defendant permitted Tipper to experience "unnecessary suffering," as prohibited by the animal cruelty

---

[5] The complaint application contains no further information about the "pain pills."  For example, it neither provides the generic or brand name of these pills, nor does it explain when or how these pills were obtained.

[6] Although not explicitly stated in the complaint application, the record shows that Tipper was later seized by the officer pursuant to a warrant and euthanized.

statute. On June 14, 2022, a judge granted the defendant's amended motion, writing in a margin endorsement: "I do not conclude that the statute contemplates an affirmative obligation to euthanize an animal loved and cared for by its owner."

The Commonwealth appealed from the motion judge's decision to the Appeals Court. In affirming the dismissal of the complaint, the Appeals Court reasoned that the plain language of the animal cruelty statute indicated that "the Legislature deliberately chose to criminalize only situations where someone (or something) 'subjected' the animal to the harm at issue." Russo, 103 Mass. App. Ct. at 323. Further, because there was no case law "in which a person's failure to intervene with the complicated, heartbreaking, painful end of an animal's life has been interpreted as 'subjecting' an animal to statutorily prohibited harm," the court "decline[d] to extend the statute in this way." Id. at 324.

We granted the Commonwealth's application for further appellate review.

Discussion. 1. Standard of review. Whether there is probable cause to issue a criminal complaint is a question of law, which we review de novo. See Commonwealth v. Manolo M., 486 Mass. 678, 691-692 (2021). Our review is limited to the "four corners of the complaint application" (citation omitted), Commonwealth v. Orbin O., 478 Mass. 759, 762 (2018), which "must

establish probable cause by providing reasonably trustworthy information sufficient to warrant a reasonable or prudent person in believing that the defendant has committed the offense," Commonwealth v. Brennan, 481 Mass. 146, 149 (2018). The existence of probable cause is determined from the totality of the circumstances. See Ilya I., 470 Mass. at 628. Although probable cause requires "considerably less than proof beyond a reasonable doubt," Commonwealth v. Humberto H., 466 Mass. 562, 565-566 (2013), speculation alone is insufficient. See Commonwealth v. Costa, 97 Mass. App. Ct. 447, 450 (2020) (complaint did not establish probable cause where it "relie[d] upon speculation rather than reasonable inferences"). Probable cause must be established for each element of the charged offense. See Ilya I., supra at 627. We consider the evidence in the light most favorable to the Commonwealth. Brennan, supra.

2. The animal cruelty statute. Whether probable cause was established in this case turns on the proper interpretation of G. L. c. 272, § 77. As with any question of statutory construction, we begin by examining the plain language of the statute. Commonwealth v. Escobar, 490 Mass. 488, 493 (2022). Where the statute itself does not define a term, we look to its plain and ordinary meaning. Commonwealth v. Tinsley, 487 Mass. 380, 386 (2021). "We derive the words' usual and accepted

meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions" (citation omitted).  Matter of the Estate of Slavin, 492 Mass. 551, 554 (2023).  If the plain language is "clear and unambiguous," our analysis is complete (citation omitted).  Commonwealth v. McNeil, 492 Mass. 336, 337 (2023).  See Escobar, supra ("Where the language of a statute is plain and unambiguous, it is indicative of legislative intent, and a reviewing court relies upon that statutory language, unless to do so would create an absurd result").  Our primary aim in statutory interpretation is to analyze the statute consistent with the Legislature's intent.  See Commonwealth v. A.Z., 493 Mass. 427, 430 (2024).

The Legislature enacted the animal cruelty statute to prevent "both intentional and neglectful animal cruelty." Commonwealth v. Duncan, 467 Mass. 746, 751, cert. denied, 574 U.S. 891 (2014).  See Commonwealth v. J.A., 478 Mass. 385, 390 (2017) (Cypher, J., concurring) ("Preventing animal cruelty is . . . a crucial public policy goal in Massachusetts").  To that end, the statute lists numerous means by which it may be violated, providing:

> "Whoever overdrives, overloads, drives when overloaded, overworks, tortures, torments, deprives of necessary sustenance, cruelly beats, mutilates or kills an animal, or causes or procures an animal to be overdriven, overloaded, driven when overloaded, overworked, tortured, tormented,

deprived of necessary sustenance, cruelly beaten, mutilated or killed; and whoever uses in a cruel or inhuman manner in a race, game, or contest, or in training therefor, as lure or bait a live animal, except an animal if used as lure or bait in fishing; and whoever, having the charge or custody of an animal, either as owner or otherwise, inflicts unnecessary cruelty upon it, or unnecessarily fails to provide it with proper food, drink, shelter, sanitary environment, or protection from the weather, and whoever, as owner, possessor, or person having the charge or custody of an animal, cruelly drives or works it when unfit for labor, or willfully abandons it, or carries it or causes it to be carried in or upon a vehicle, or otherwise, in an unnecessarily cruel or inhuman manner or in a way and manner which might endanger the animal carried thereon, or <u>knowingly and willfully authorizes or permits it to be subjected to unnecessary torture, suffering or cruelty of any kind</u> shall be punished . . ." (emphasis added).

G. L. c. 272, § 77.

The statute begins with, and largely consists of, a long list of "thou shall not" provisions that directly prohibit a defendant's harmful actions or omissions.  See <u>Russo</u>, 103 Mass. App. Ct. at 322.  For example, it is a crime to "overdrive[], overload[], drive[] when overloaded, overwork[], torture[], torment[], deprive[] of necessary sustenance, cruelly beat[], mutilate[] or kill[] an animal."  G. L. c. 272, § 77.  See <u>Russo</u>, <u>supra</u>.  The statute further proscribes "us[ing] [an animal] in a cruel or inhuman manner in a race, game, or contest" and "cruelly driv[ing] or work[ing] [an animal] when unfit for labor."  G. L. c. 272, § 77.  See <u>Russo</u>, <u>supra</u>.  Our case law reflects the type of conduct prohibited under these provisions.  See, e.g., <u>Commonwealth</u> v. <u>Curry</u>, 150 Mass. 509,

512 (1890) (unnecessarily leaving horse in woods without food and drink for more than twenty-four hours violated animal cruelty statute); Commonwealth v. Turner, 145 Mass. 296, 301 (1887) ("throwing a captive fox among dogs, to be mangled and torn by them" violated animal cruelty statute); Commonwealth v. Whitson, 97 Mass. App. Ct. 798, 803-804 (2020) (plunging knife five times deeply into dog violated animal cruelty statute); Commonwealth v. Daly, 90 Mass. App. Ct. 48, 51-52 (2016) ("throw[ing] a dog on its leash onto a deck with force enough to cause the animal to fall off the deck, twelve feet to its death" violated animal cruelty statute); Commonwealth v. Szewczyk, 89 Mass. App. Ct. 711, 716-717 (2016) ("[s]hooting the dog and having the pellet lodge in her hind leg, deep into the muscle and close to the bone" violated animal cruelty statute); Commonwealth v. Zalesky, 74 Mass. App. Ct. 908, 908 (2009) (beating dog with plastic bat at "full swing" violated animal cruelty statute).

In contrast to the "thou shall not" provisions is the final clause of the animal cruelty statute, which prohibits "owner[s], possessor[s], or person[s] having the charge or custody of an animal . . . [from] knowingly and willfully authoriz[ing] or permit[ting] [an animal] to be subjected to unnecessary torture, suffering or cruelty of any kind." G. L. c. 272, § 77. This clause stands out for its inclusion of the heightened mental

state of "knowingly" and "willfully."[7] Russo, 103 Mass. App. Ct. at 323. Therefore, to analyze whether the Commonwealth established probable cause that the defendant violated this statutory provision, we must examine its language to determine the requisite criminal intent for this portion of the statute.

The term "knowingly" "typically 'imports a perception of the facts requisite to make up the crime.'" Commonwealth v. McGhee, 472 Mass. 405, 415 (2015), quoting Commonwealth v. Altenhaus, 317 Mass. 270, 273 (1944). "An act is done 'knowingly' if it is the product of conscious design, intent or plan that it be done, and is done with awareness of probable consequences" (citation and quotation omitted). Commonwealth v. Becker, 71 Mass. App. Ct. 81, 89, cert. denied, 555 U.S. 933 (2008). See Commonwealth v. Rosado, 450 Mass. 657, 662 (2008) (conviction for "knowingly" providing false sex offender registration required proof defendant knew information was false, not that defendant intended to deceive).

We generally construe statutes "in a manner that is consistent with ordinary English usage." Commonwealth v. Cassidy, 479 Mass. 527, 534, cert. denied, 139 S. Ct. 276, (2018), citing Flores-Figueroa v. United States, 556 U.S. 646,

---

[7] There is one other instance in the statute where a "willful" mental state is expressly required: "willfully abandon[ing]" an animal. G. L. c. 272, § 77.

652 (2009).  Grammatically, where the term "knowingly" modifies the verb or verbs in a statute, it likewise modifies the object of the verb and phrases which limit that object.  See Cassidy, supra at 535-536.  Here, the term "knowingly" must be read to apply not only to the verbs, "authorizes" and "permits," but also to the object, "it" (i.e., the animal), and the object complement, "to be subjected to unnecessary torture, suffering or cruelty of any kind."  See id. at 536 ("knowingly" in statute proscribing unlawful possession of large capacity feeding devices, G. L. c. 269, § 10 [m], applies to both "has in his possession" and "large capacity weapon"); Commonwealth v. Daley, 463 Mass. 620, 624 (2012) ("knowingly" in statute criminalizing leaving scene of accident where death resulted, G. L. c. 90, § 24 [2] [a 1/2] [2], applies to both "colliding" and "causing injury").  Therefore, to establish a violation of G. L. c. 272, § 77, the Commonwealth must prove that the defendant consciously authorized or permitted something that the defendant was aware would subject an animal to "unnecessary torture, suffering or cruelty of any kind."  See Daly, 90 Mass. App. Ct. at 51 ("cruelly" in section of animal cruelty statute punishing anyone who "cruelly beats, mutilates or kills an animal" applies to "each of the subsequently listed verbs or elements of the crime").

The term "willfully" "takes on different meanings in different contexts."  Shannon, The Willfulness Requirement:  A Chameleon in the Legal Arena, 60 La. L. Rev. 563, 563 (2000).  See Millis Pub. Sch. v. M.P., 478 Mass. 767, 776 (2018) ("the term 'wilfully' may have several meanings when read in isolation").  Two oft-repeated definitions of "willful" or "willfully" are (1) "intentionally or purposely as distinguished from accidentally or negligently," without requiring "any actual impropriety," and (2) acting with "a bad purpose or evil intent."  R.M. Perkins & R.N. Boyce, Criminal Law 875–876 (3d ed. 1982).

In Massachusetts, we have utilized both meanings of a "willful" mental state in different circumstances.  In some cases, the Commonwealth is required to prove the defendant committed an intentional, nonaccidental act.  See Millis Pub. Sch., 478 Mass. at 776.  See also Commonwealth v. Dung Van Tran, 463 Mass. 8, 26 (2011) (willful conduct in context of arson is that which is "intentional rather than accidental" and requires no ill will).  In other instances, the Commonwealth must establish that a defendant intends both her actions and their harmful consequences.  See, e.g., Commonwealth v. Adams, 482 Mass. 514, 527 (2019) (interference with officer); Commonwealth v. Armand, 411 Mass. 167, 170 (1991) (destruction of personal property); Commonwealth v. Joyce, 84 Mass. App. Ct. 574, 578

(2013) (interference with firefighter); Commonwealth v. Jenkins, 47 Mass. App. Ct. 286, 290-291 (1999) (stalking); Commonwealth v. Kingston, 46 Mass. App. Ct. 444, 445 (1999) (filing materially incorrect income tax returns).

Here, to determine the Legislature's intent in the use of "willfully" within the animal cruelty statute, we look to the broader statutory context of G. L. c. 272, § 77. Millis Pub. Sch., 478 Mass. at 776. See ENGIE Gas & LNG LLC v. Department of Pub. Utils., 475 Mass. 191, 199 (2016) ("The court does not determine the plain meaning of a statute in isolation, but, rather, . . . '[examines] the surrounding text, structure, and purpose of the Massachusetts act'" [citation omitted]). This section of the statute expressly includes not only the animal owner's actions -- the authorization or permission -- but also the harmful consequences of those actions -- unnecessary "torture," "suffering," and "cruelty." In that respect, the animal cruelty statute is similar to G. L. c. 268, § 32A, which prohibits "willfully obstruct[ing], interfer[ing] with or hinder[ing] a fire fighter in the lawful performance of his duty." The Appeals Court interpreted "willfully" in G. L. c. 268, § 32A, to mean that a "defendant must intend not just his conduct, but the harmful consequences of the conduct -- that is, the interference with, obstruction, or hindrance of the fire fighter." Joyce, 84 Mass. App. Ct. at 578.

In light of the similar structure and surrounding terms of the animal cruelty statute, we read the term "willfully" to function in the same manner here. To prove the defendant acted "willfully," we conclude that the Commonwealth must show the defendant intended both the underlying action and its harmful consequences. In other words, the defendant must intend for the animal to be subjected to "unnecessary torture, suffering or cruelty." G. L. c. 272, § 77.

3. <u>Probable cause analysis</u>. Having established the meaning of the terms "knowingly" and "willfully" within the animal cruelty statute, we conclude that the Commonwealth failed to establish that the defendant's conduct was willful.[8] The defendant brought Tipper to the animal hospital twice seeking medical care. Faced with difficult choices, the defendant took Tipper home to die with the understanding that nothing could be done to alleviate his pain, short of euthanasia. The complaint application further details the efforts of the defendant's family to make Tipper comfortable in the time he had remaining.

---

[8] In reviewing the motion judge's decision granting the defendant's motion to dismiss for lack of probable of cause, we are "free to affirm a ruling on grounds different from those relied on by the motion judge if the correct or preferred basis for affirmance is supported by the record and the findings." <u>Commonwealth</u> v. <u>Va Meng Joe</u>, 425 Mass. 99, 102 (1997). See <u>Commonwealth</u> v. <u>Santa Maria</u>, 97 Mass. App. Ct. 490, 494 (2020) (concluding probable cause existed "on grounds slightly different from those articulated by the motion judge").

These allegations do not create a reasonable inference that the defendant intended for Tipper to unnecessarily suffer.[9]

Nonetheless, the Commonwealth asserts that other evidence, such as the defendant's telephone message to the ARL claiming that Tipper was in good health and acting normally again, was "untruthful."  This falsehood, according to the Commonwealth, indicates the defendant's ill intent to cause Tipper to suffer unnecessarily.  The reason why the defendant intended to avoid contact with the ARL -- whether, for example, it was to prolong Tipper's unnecessary suffering or to keep him in her care -- is speculative.  Speculation alone is insufficient to establish probable cause.  See Costa, 97 Mass. App. Ct. at 450.

The complaint application failed to establish probable cause that the defendant intended for Tipper to unnecessarily suffer when she declined to follow the veterinarian's recommendation to euthanize Tipper and brought him home to die.  Our opinion should not be read to condone the conduct alleged in the complaint or take a position one way or the other regarding "complicated" and "heartbreaking" end of life decisions.  Russo,

---

[9] The defendant asserts that the meaning of "unnecessary" suffering is unconstitutionally vague as applied.  Because we conclude that the complaint was unsupported by probable cause, we decline to resolve this constitutional question.  See Dinkins v. Massachusetts Parole Bd., 486 Mass. 605, 616 (2021) ("We do not decide constitutional questions unless they must necessarily be reached" [citation omitted]).

103 Mass. App. Ct. at 324.  Instead, we hold, on these facts, that the defendant committed no crime.

Conclusion.  The dismissal of the complaint against the defendant is affirmed.[10]

So ordered.

---

[10] The defendant requests leave pursuant to Mass. R. Crim. P. 15 (d), as amended, 476 Mass. 1501 (2017), to file affidavits "and other information" in support of her request for appellate attorney's fees and costs.  The defendant may file such affidavits within thirty days of the issuance of the rescript. See Commonwealth v. Ennis, 441 Mass. 718, 720 (2004).  The Commonwealth shall then have thirty days to respond.  Id. at 721 n.3.